ELECTRIC SMELTING & ALUMINUM CO. v. CARBORUNDUM CO.

(Circuit Court of Appeals, Third Circuit. May 28, 1900.)

No. 1.

1. PATENTS—PROCESS—CONSTRUCTION OF CLAIMS.
   The claims of a process patent may be read in the light of the specification or description of the process, not for the purpose of their enlargement, but to determine their real meaning.

2. SAME—INACCURATE USE OF TERMS.
   A patent for a method of "smelting or reducing ores or metalliferous compounds herein described," which describes "silicium" as one of the metals, ores or compounds which may be treated by the process, is infringed by the use of such process for the manufacture of carbide of silicon or "carborundum." The fact that silica, or oxide of silicon, which is the substance treated, is not, strictly speaking, an "ore," or silicon a "metal," according to the modern definition, and that their classification as such in the patent is inaccurate, cannot operate to exclude them from its operation, contrary to the plain intention of the patentee.

3. SAME.
   In determining whether a patent complies with the requirement of Rev. St. § 4888, by fully and clearly setting forth the invention in the description, so as to enable a person skilled in the art to use the same, the claims may be considered in connection with the specification; and in a process patent it is no objection that the claims are broader than the illustration of the process given in the description.

4. SAME—INFRINGEMENT—ELECTRIC SMELTING PROCESS.
   The Cowles patent, No. 319,795, for a process of smelting ores or metalliferous compounds by an electric current, by interposing within the circuit, so as to form a continuous and unbroken part of the same, a body of granular material of high resistance or low conductivity, such as electric light carbon, which, by reason of its resistance, is made incandescent and generates the required heat, was not anticipated, and is valid. As to claims 1, 2, and 4 it is not limited to the method of mixing the granular material with the ore or other material to be treated, but requires only that the two shall be in contact; and such claims are infringed by the Acheson method of manufacturing carbide of silicon or "carborundum," in which the heat required to effect the reduction of the oxide of silicon and the uniting of the silicon and carbon is produced by passing an electric current through a central core of granulated carbon, around which the mixture of silica and carbon is packed.

5. SAME—ELECTRIC SMELTING FURNACE.
   The Cowles patent, No. 319,945, for an electric smelting furnace, is not infringed by the form of furnace used in the Acheson method of producing carbide of silicon or "carborundum."

Appeal from the Circuit Court of the United States for the Western District of Pennsylvania.

C. M. Vorce, for appellant.

George H. Christy and Thomas W. Bakewell, for appellee.

Before DALLAS and GRAY, Circuit Judges, and BRADFORD, District Judge.

BRADFORD, District Judge. This is an appeal from the final decree of the circuit court for the Western district of Pennsylvania dismissing a bill charging infringement of letters patent of the United States Nos. 319,795, 319,945 and 335,058. 83 Fed. 492. Pat-

ents Nos. 319,795 and 319,945 were issued June 9, 1885, to Eugene H. Cowles and Alfred H. Cowles, the former patent being for an improvement in "Processes for Smelting Ores by the Electric Current," and the latter for an improvement in "Electric Smelting Furnaces." Patent No. 335,058 was issued January 26, 1886, to Alfred H. Cowles for an improvement in "Electric Furnaces and Method of Operating the Same." The several patents were assigned to and are now owned by the appellant. Since the filing of the bill the charge of infringement has been restricted by the appellant to the two earlier patents, and it is therefore unnecessary to consider patent No. 335,058. The answer sets up the usual defenses. The claims of patent No. 319,795 are as follows:

"(1) The method of generating heat for metallurgical operations herein described, which consists in passing an electric current through a body of broken or pulverized resistance material that forms a continuous part of the electric circuit, the ore to be treated by the process being brought into contact with the broken or pulverized resistance material, whereby the heat is generated by the resistance of the broken or pulverized body throughout its mass, and the operation can be performed solely by means of electrical energy.

"(2) The method of smelting or reducing ores or metalliferous compounds herein described, which consists in subjecting the ore in the presence of carbon to the action of heat generated by passing an electric current through a body of broken or pulverized resistance material that forms a continuous part of the electric circuit, the ore being in contact with the broken or pulverized resistance material, whereby the ore is reduced by the combined action of the carbon and of the heat generated solely by the resistance of the broken or pulverized body throughout its mass.

"(3) The method of smelting or reducing ores or metalliferous compounds herein described, which consists in pulverizing the ore and mixing with it pulverized or broken carbon or like material, then introducing the mixed ore and carbon within an electric circuit, of which it forms a continuous part, the said circuit being established through the carbon constituents of the mass, whereby the heat is generated by the electrical resistance of the carbon throughout the mass, and the operation can be performed entirely by means of the carbon reagent and the electric energy.

"(4) The method of smelting or reducing ores or metalliferous compounds herein described, which consists in subjecting the ore in the presence of a reducing agent to the action of heat generated by passing an electric current through a body of broken or pulverized resistance material that forms a continuous part of the electric circuit, the ore being in contact with the broken or pulverized resistance material, whereby the ore is reduced by the combined action of the reducing agent and of the heat generated solely by the resistance of the broken or pulverized body throughout its mass."

The alleged infringement consists of the manufacture by the appellee of silicide of carbon or carbide of silicon or, as it is commonly known, carborundum, in which the constituent elements are carbon and silicon, each molecule containing one atom of carbon united with one atom of silicon. Carborundum is practically as hard as diamond, and is in large and growing demand for abrasive and cutting purposes. In the process of its manufacture a mixture of carbon and oxide of silicon, commonly known as silica or common sand, is prepared and in this mixture a core composed solely of coarse granular carbon is introduced directly between the electrodes, having good electrical connection at its ends with the electrodes. As compared with the mixture of carbon and silica the core pre-

sents less resistance to the passage of the electric current. It furnishes at once a path of higher temperature and of less resistance than the mixture to be treated; the larger portion or, perhaps, for practical purposes, all of the current passing through and along the core. The mixture of carbon and silica with a small percentage of salt and sawdust surrounds the core throughout its length to a thickness as great as or greater than can effectively be operated on by heat transmitted from the core. The mixture with the central core is enclosed on the sides by brick walls loosely built. When an electric current of comparatively high voltage is turned on the core is heated to a very high temperature, probably exceeding 7,000° F., and the core heats the charge mixture to such an extent that the atoms composing the molecules separate from each other. The atoms of the constituent elements of the mixture, having thus become disassociated, unite through chemical affinity and form the crystalline combination or compound known as carborundum. The appellee contends that patent No. 319,795, is restricted to a process for metallurgical purposes, ore being mentioned in each of the claims; that what the appellee treats or reduces is not an ore, nor is the product of its process a metal, and that consequently its operations do not involve a metallurgical process and do not infringe the process patent in suit. This contention cannot be sustained. It appears from the specification that the patentees included silicon among the metals and treated silica as a metalliferous compound. In the description they say:

"We will illustrate and describe a zinc-furnace embodying our invention, from which the application of the same to the reduction or smelting of other kinds of ores will be readily understood, especially of aluminum, silicium, magnesium, boron, and other rare metals, which are not reducible by the smelting processes heretofore known."

It is evident that by the patent silicium or silicon was classed among metals, and sand or silica among ores or metalliferous compounds. Whether silicon or carborundum is strictly a metal is, under the circumstances, an immaterial inquiry. The designation of silicon as a metal is not such a fault as in any manner to control the effect of the description. While it may be an inaccurate use of language it is at most a harmless and immaterial error. Walk. Pat. § 175; Rob. Pat. § 490. The claims should be read in the light of the description, not for the purpose of their enlargement, but to ascertain their real meaning. Thus construed there can be no doubt that the terms "metallurgical," "metalliferous" and "ore" apply as well to silica as to the ores of aluminum, magnesium, boron and other metals. It may further be observed that the evidence shows that silicon has not uncommonly been mentioned by text writers and others as and understood to be a metal. In an earlier edition of Webster's dictionary silicium is referred to as follows: "Silicium. Silicon, which see. The name silicium was given by those who supposed it to be a metal like sodium." Worcester thus refers to it: "Silicium. The name formerly applied to silicon, when it was classed with the metals."

The principal question touching infringement of the process patent in suit relates to the disposition of the resistance material with respect to the material to be treated.  The appellee, as before stated, uses a central core of granular carbon as resistance material, surrounded with a mixture of silica and granular carbon.  The core becomes incandescent under the action of the electric current and radiates the heat necessary for the formation of carborundum.  The appellee contends that on a proper construction of this patent the monopoly does not extend to the use of such a central core, but is limited to the use of resistance material mixed with the material to be treated in such manner that under the action of the electric current heat is generated by the incandescence of the particles of such resistance material scattered throughout the body or mass composed of resistance material and material to be treated; that the distinctive difference between the process of the appellee and that of the appellant is that while in the former there is a diffusion of heat through the material to be treated resulting almost wholly from radiation from the incandescent central core, in the latter the generation of heat is not localized but occurs practically throughout the entire mass of resistance material and material to be treated by reason of the comparatively even distribution through such mass of the particles of resistance material, or that, in other words, in the appellee's process there is a diffusion of heat by radiation and in that of the appellant a diffusion of heat through generation thereof at numberless points throughout the combined mass.  The learned judge below, having reached a conclusion in accordance with the contention of the appellee in this connection, held that infringement of the process patent in suit had not been established.  Considering silica for the purposes of this suit in the light in which it was viewed by the patentees, namely, as a metalliferous compound, we proceed to examine with some detail the description and claims of the patent. The patentees state:

"The present invention relates to the class of smelting-furnaces which employ an electric current solely as a source of heat.  Heretofore it has been attempted to reduce ores and perform metallurgical operations by means of an electric arc, the material to be treated being brought within the field of the arc or passed or fed through it; but numerous experiments have demonstrated that the arc system is not adapted for long and continuous operations on a scale of any considerable magnitude.  The difficulties attending the regulation of the arc and the preservation of a constant resistance are very great, and the heat generated, though intense, is localized and difficult to control."

The patentees here distinctly repudiate the electric arc as an instrumentality for the accomplishment of their purpose for the reasons that the heat generated "is localized and difficult to control" and "the arc system is not adapted for long and continuous operations on a scale of any considerable magnitude."  An electric arc has no part either in the process of the appellee or in that of the appellant. Both operate through heat resulting from incandescence of the resistance material under the action of an electric current.  The patentees proceed:

"The object of this invention is to provide a process by which electricity can be practically employed for metallurgical operations, and for this purpose to

secure a distribution of the intense heat which it is well known electricity is capable of generating over a large area or through a large mass in such a manner that a high temperature can be sustained for a long time and controlled."

Here the patentees propose to provide an electrical process for metallurgical operations which shall secure, in contradistinction to the action of an electric arc, a distribution of the heat produced by electricity "over a large area or through a large mass" in such manner that "a high temperature can be sustained for a long time and controlled." So far nothing is definitely said as to the extent of the area or the size of the mass over or through which the heat was to be distributed, nor whether the heat was to be distributed through radiation from its point or points of generation, or by distributing its points of generation. The language used is just as applicable to the large central core used by the appellee as to the distributed mass of carbon granules which is in fact employed by the appellant. Having thus stated the object of their invention the patentees proceed:

"To this end the invention consists, essentially, in the use for metallurgical purposes of a body of granular material of high resistance or low conductivity interposed within the circuit in such a manner as to form a continuous and unbroken part of the same, which granular body by reason of its resistance is made incandescent and generates all the heat required."

This language is literally applicable to the process of the appellee. The patentees then state the usual method of employing their process as follows:

"The ore or like material to be reduced—as, for example, the hydrated oxide of aluminum, alum, chloride of sodium, oxide of calcium, or sulphate of strontium—is usually mixed with the body of granular resistance material, and is thus brought directly in contact with the heat at the points of generation at the same time the heat is distributed through the mass of granular material, being generated by the resistance of all the granules, and is not localized at one point or along a single line."

It will be observed that the heat is distributed throughout "the mass of granular material," and "is not localized at one point or along a single line" in the mass of such material. The patentees thus state that the usual, and presumably the preferable, method of conducting the process involves a mixture of the ore to be reduced with the resistance material. The statement of the usual method fairly implies the existence of other methods in which the ore and resistance material need not be so mixed. The patentees then describe the character of the granular material adapted for the generation of heat under their process as follows:

"The material best adapted for this purpose is electric-light carbon, as it possesses the necessary amount of electrical resistance, and is capable of enduring any known degree of heat when protected from oxygen without disintegrating or fusing; but crystalline silicon or other equivalent of carbon can be employed for the same purpose. This is pulverized or granulated, the degree of granulation depending upon the size of the furnace. Coarse granulated carbon works better than finely pulverized carbon and gives more even results. The electrical energy is more evenly distributed, and the current cannot so readily form a path of highest temperature and consequently of least resistance through the mass along which the entire current or the bulk of the current can pass; but the scope of this invention is not limited by the degree

of granulation, as that may vary with the conditions of the case, and with a large furnace and a powerful current the size of the carbon particles may pass beyond what is ordinarily understood by the term 'granular' and be, in fact, pieces of carbon of considerable size. Still the resistance body is ordinarily composed of grains or pieces proximately equal in size, in order to secure an even distribution of the electrical energy."

The description points out that the best resistance material for the patented process is electric-light carbon, though "crystalline silicon or other equivalent of carbon" can be used for the same purpose; that coarse granulated carbon is more satisfactory and gives more even results than finely pulverized carbon in that "the electrical energy is more evenly distributed and the current cannot so readily form a path of highest temperature and consequently of least resistance through the mass along which the entire current or the bulk of the current can pass." Now "the entire current or the bulk of the current" passes through the resistance material, whether that material is mixed with the ore or otherwise is in contact with it, and the path referred to is one through the mass of the resistance material or resistance body. An "even distribution of the electrical energy" through the mass of the resistance material is promoted when the latter "is composed of grains or pieces proximately equal in size." The patentees describe a certain mode of conducting the process where the resistance material and material to be treated are mixed, and say:

"It will be observed that the intimate mixture of incandescent carbon and ore affords the most effective utilization of all the heat evolved. None of it is lost by transmission through any intervening bodies or spaces. Moreover, the maximum degree of heat generated by the furnace is within the ore body and the retort and furnace receive only the heat which is transmitted outward from the ore and carbon contained within."

Before adverting to the claims of the process patent it is important to consider the limitations of the invention as disclosed in the description. Does the process require in all cases an intimate mixture or commingling of the resistance material and the material to be treated? Or is such mixture or commingling required only in one form or method of practicing the invention? The learned judge below on consideration of the description and claims held that such mixture or commingling was required in all cases. In reaching this conclusion he held that the words "the ore or like material to be reduced  *  *  *  is usually mixed with the body of granular resistance material," meant merely that the ore is usually mixed with a body of granular resistance material in contradistinction, by way of illustration, to a body of "pieces of carbon of considerable size" and "beyond what is ordinarily understood by the term 'granular,'" but not that a mixture of the ore and resistance material could in any case be dispensed with. For several reasons we cannot adopt this view. There is nothing in the description taken as a whole which requires such a construction. To accept it would involve a departure from the natural and customary sense of the language employed. The context will not fairly admit of such construction. The patentees had just stated

that their invention "consists, essentially, in the use for metallurgical purposes of a body of granular material of high resistance or low conductivity interposed within the circuit in such a manner as to form a continuous and unbroken part of the same, which granular body by reason of its resistance is made incandescent and generates all the heat required." Nothing is there said touching the size of the granules of the resistance material or indicating whether they were or were not carbon, or showing how the resistance material was to be placed with respect to the subject to be treated— whether to be mixed with the latter or otherwise brought in contact with it. They then state that the subject to be treated "is usually mixed with the body of granular resistance material," but do not in the sentence containing these words indicate of what nature the granules are. They subsequently refer to electric-light carbon as the best resistance material and state that it can be granulated or pulverized or used in pieces of a size "beyond what is ordinarily understood by the term 'granular.'" The size of the granules, particles or pieces of carbon bears on the evenness of distribution of the electrical energy throughout the body or mass of resistance material, but has no relation to the question whether that body or mass is to be mixed with the subject of treatment or otherwise placed in contact with it. The fact that the "body of granular resistance material" may consist of carbon, broken, granulated or pulverized, or even of "crystalline silicon or other equivalent of carbon," does not differentiate it from the "body of granular material" as referred to in the statement of the essence of the invention or from the "body of granular resistance material" as used in the sentence in question. Careful examination has failed to disclose anything in the description limiting the invention to a process requiring mixture of the resistance material with the material to be treated. Turning now to the language of the claims, it will be found that only one of them, the third, is restricted to such a mixture. That claim requires the introduction of a mixture of pulverized ore and pulverized or broken carbon within the electric circuit "of which it forms a continuous part, the said circuit being established through the carbon constituents of the mass, whereby the heat is generated by the electrical resistance of the carbon throughout the mass." Here there is an express limitation to a mixed body composed of resistance material and material to be treated. And the term "mass" is applied to such mixed body, as is evident from the expressions "the carbon constituents of the mass" and "the carbon throughout the mass." But the other claims are essentially different from the third. Claim 1 requires the passage of an electric current through "a body of broken or pulverized resistance material that forms a continuous part of the electric circuit, the ore to be treated by the process being brought into contact with the broken or pulverized resistance material, whereby the heat is generated by the resistance of the broken or pulverized body throughout its mass." Claim 2 requires the subjection of ore in the presence of carbon to the action of heat generated by passing an electric current through "a body of broken

or pulverized resistance material that forms a continuous part of the electric circuit, the ore being in contact with the broken or pulverized resistance material, whereby the ore is reduced by the combined action of the carbon and of the heat generated solely by the resistance of the broken or pulverized body throughout its mass." Claim 4 requires the subjection of the ore in the presence of a reducing agent to the action of heat generated by passing an electric current through a body of broken or pulverized resistance material forming a continuous part of the electric circuit, "the ore being in contact with the broken or pulverized resistance material, whereby the ore is reduced by the combined action of the reducing agent and of the heat generated solely by the resistance of the broken or pulverized body throughout its mass." The language of claims 1, 2 and 4 requires only contact between the resistance material and the material to be treated, in contradistinction to an intermixture or commingling of the two. Unless the language of these three claims is to receive an unusual and forced interpretation, the term "mass" as therein employed must be held to refer to the body of resistance material throughout which the heat is generated by the passage of the electric current, and is not restricted to a mixture of resistance material and material to be treated, as mentioned in claim 3. The language is so clear and unambiguous as to require cogent reasons to justify a different construction. Do such reasons exist? It may fairly be assumed that if the patentees intended that all the claims should be restricted to a mixture, they would not, while expressly confining themselves to a mixture in claim 3, have employed language in claims 1, 2 and 4 requiring only contact. On the face of the claims, considered apart from the rest of the specification, it is obvious that the patentees distinguished between contact between the resistance material and the material to be treated and an intermixture of one with the other. The description of the patent strongly tends to confirm the conclusion drawn from the language of the claims. In the description the word "mass" occurs in five places: First, where the patentees in stating the object of their invention refer to the "distribution of the intense heat which it is well known electricity is capable of generating over a large area or through a large mass." Second, where reference is made to the distribution of heat "through the mass of granular material, being generated by the resistance of all the granules." Third, where it is stated that "the current cannot so readily form a path of highest temperature and consequently of least resistance through the mass along which the entire current or the bulk of the current can pass." Fourth, where the statement is made touching the usual or preferable method of practicing the process that "the carbon constituents of the mass become incandescent." Fifth, where it is said that "the degree of heat evolved will be determined by the resistance or conductivity of the mass and the strength of the current employed." With the exception of the fourth instance of the use of the word "mass" in the description, that term clearly is used to designate the body of resistance

material in which the heat is generated by the passage of the electric current, and does not include the material to be treated. In the fourth instance of the employment of that term it is used in connection with the usual or preferable method in which the ore is "mixed with the body of granular resistance material," and includes not only 'the ore but the resistance material, "the carbon constituents of the mass" becoming incandescent. But it is equally clear that the term is not so employed in any of the claims other than the third, but means only "the body of broken or pulverized resistance material" throughout which the heat is generated. It is thus evident on the face of the whole specification that while claim 3 requires an intermixture of the resistance material and the material to be treated, no one of the other claims requires such intermixture, but only contact between the two. The appellee contends that by reason of proceedings in the patent office, if the patent has any validity, the process must be held to be confined to an intermixture of the ore and resistance material. Can this contention be sustained? In their original application December 24, 1884, the Messrs. Cowles stated in the description, among other things:

"All electric furnaces can be classified under one or two heads, arc furnaces and incandescent furnaces, the heat being generated in the former class by means of an electric arc, and in the latter class from the incandescence of a resistance body. Our invention belongs to this last named class of furnaces, but the incandescent medium, whatever it may be, is used in a pulverized or granular state, instead of a solid form; and herein lies the essential feature of the invention, which consists in the use, in an electric furnace, of granular or pulverized resistance material, through which the electric current passes, causing the same to become incandescent and thus evolving heat. The material to be treated in the furnace may be mixed with the granular resistance medium, or imbedded in it, or otherwise brought in close contact therewith; or it may constitute, in itself, the resistance medium, according to the character of the material and the object sought to be accomplished. In this way the close proximity of the incandescent medium and the material to be treated is secured with the most important and beneficial results."

It will be observed that the patentees originally sought to secure a patent for an incandescent as distinguished from an arc furnace in which the material to be treated, first, might be "mixed" with granular or pulverized resistance material, second, might be "imbedded" in such resistance material, third, might otherwise be brought "in close contact" with such resistance material, and, fourth, might constitute, in itself, the "resistance medium, according to the character of the material and the object sought to be accomplished." After full and prolonged consideration by the patent office of the original application and of various amendments by way of cancellation and addition, and after all apparatus claims had been withdrawn and reserved for a separate application, the application as embodied in the process patent was allowed February 14, 1885. During the proceedings the second and fourth methods above mentioned, involving respectively embedding in the resistance material of the material to be treated, and an electrolytic treatment of the material to be treated in the absence of any other resistance material, were eliminated, but the first and third methods, involving respectively

mixture of or other contact between the resistance material and the material to be treated, were allowed and incorporated in the patent. We find nothing in the proceedings in the patent office on the application for the patent by way of disclaimer or otherwise, to indicate that the word "contact," as used in claims 1, 2 and 4, was intended to be restricted to the form of contact consisting of mixture. It is further contended by the appellee that all of the claims require an intermixture of the resistance material with the material to be treated, for the reason that the description of the patent does not show any method of conducting the process otherwise than by such mixture, and reference is made by the learned judge below to section 4888, Rev. St., providing that before an inventor shall receive a patent for his invention he "shall file in the patent office a written description of the same, and of the manner and process of making, constructing, compounding, and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected, to make, construct, compound and use the same; and in case of a machine he shall explain the principle thereof, and the best mode in which he has contemplated applying that principle, so as to distinguish it from other inventions; and he shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery." The patentees state the object and essence of their invention as follows:

"The object of this invention is to provide a process by which electricity can be practically employed for metallurgical operations, and for this purpose to secure a distribution of the intense heat which it is well known electricity is capable of generating over a large area or through a large mass in such a manner that a high temperature can be sustained for a long time and controlled. To this end the invention consists, essentially, in the use for metallurgical purposes of a body of granular material of high resistance or low conductivity interposed within the circuit in such a manner as to form a continuous and unbroken part of the same, which granular body by reason of its resistance is made incandescent and generates all the heat required."

They then state that the usual method of conducting the process involves an intermixture of the resistance material with the material to be treated, and point out the nature of the resistance material and degree of its granulation or pulverization best suited for the purpose. They further state that "the operation must necessarily be conducted within an air-tight chamber or in a non-oxidizing atmosphere, as otherwise the carbon will be consumed and act as fuel." The patentees having fully described one method of conducting the process it is at least questionable whether that is not sufficient to secure them against invasion of the broad process set forth in the description by a resort to any other methods of practicing it. Tilghman v. Proctor, 102 U. S. 707, 728, 732, 26 L. Ed. 279. It is true that contact otherwise than in connection with the usual or preferable method by mixture is not mentioned in the description, and had "contact" as distinguished from "mixture" been omitted from claims 1, 2 and 4 the case possibly would present itself in a very different aspect. But while claim 3 covers the preferable method by

mixture, all the other claims require only contact. If "contact" as well as "mixture" had been mentioned in the description there could have been no doubt that the requirements of the statute were fully complied with. The instruction of the patent clearly would have been sufficient to enable anyone "skilled in the art" to use the process whether by way of mixture or only contact between the resistance material and material to be treated. If claims 1, 2 and 4 are broad enough to include actual contact of any kind between the two materials, the resistance material forming part of the electric circuit may be in contact with the material to be treated whether in the form of a core or several cores, or of strata, or in any other form, to secure the most effective operation of the process under varying conditions involving the nature of the material to be treated, amount of the charge, &c. Now, if claims 1, 2 and 4, requiring only contact, be read with the description, which, while not mentioning contact otherwise than by mixture, is perfectly consistent with the conduct of the process by contact not involving mixture, anyone skilled in the art is just as fully informed of the nature of the process and the modes of conducting it as if contact otherwise than by mixture had been mentioned in the description. On the supposition that one skilled in the art would not have been instructed by the description, considered alone, that the process included not only contact by mixture but contact in other forms, the question in this connection turns on the points whether the several claims should not be read together with the specification, and, if so read, whether the requirements of the statute are not satisfied. It is apparent that reading the claims and description together cannot result in importing anything from the latter into the former either to enlarge or narrow them. The description, considered alone and without reference to the proceedings in the patent office, is broad enough to cover not only contact by way of mixture or otherwise between the resistance material and the material to be treated, but close proximity of the one to the other. Close proximity, however, was disclaimed in the patent office, and is not included in any of the claims. The reading of the specification as a whole then serves not to enlarge or narrow the claims but clearly to indicate the nature of the invention and the extent of the monopoly claimed. The limits of the monopoly are thus disclosed to the public and any part of the invention not included in the claims is abandoned to the public. The public is fully informed of all it has a right to know and the patentees are restricted to the monopoly of their invention or such part thereof as they have clearly disclosed and claimed. The claims are without fault. They, illustrated by the language of the description, are clear and definite. In The Incandescent Lamp Patent, 159 U. S. 465, 474, 16 Sup. Ct. 75, 40 L. Ed. 221, the court referring to section 4888, Rev. St., in so far as it requires the invention clearly to be disclosed, said:

"The object of this is to apprise the public of what the patentee claims as his own, the courts of what they are called upon to construe, and competing manufacturers and dealers of exactly what they are bound to avoid."

The patent when construed by a reference to the whole specification, including the description and the claims, fully accomplishes these several ends.   If a claim, uncertain when considered apart from the description, can by reference to the latter be rendered so clear as to satisfy the requirement of the statute, that the inventor "shall particularly point out and distinctly claim" his invention, by parity of reasoning a doubtful point in the description, when considered apart from the claims, can by reference to the latter, when in themselves unambiguous, be rendered so clear as to satisfy the other requirement of the statute that the inventor shall fully and clearly set forth his invention in the description.   That under such circumstances a description uncertain or indefinite when considered alone, but not inconsistent with the claims, may be rendered certain and sufficient to meet the requirements of the statute by reading the whole specification together has frequently been recognized and is, we think, a sound rule of law.   Battin v. Taggert, 17 How. 74, 85, 15 L. Ed. 37;  The Corn-Planter Patent, 23 Wall. 181, 224, 23 L. Ed. 161;  Carver v. Manufacturing Co., 2 Story, 430, 446;  Howes v. Nutes, 4 Cliff. 173, 174, Fed. Cas. No. 6,790;  Ryan v. Goodwin, 3 Sumn. 514, 520, Fed. Cas. No. 12,186;  Myers v. Frame, 8 Blatchf. 446, 457, Fed. Cas. No. 9,991;  Parker v. Stiles, 5 McLean, 44, 56, Fed. Cas. No. 10,749;  Lowell v. Lewis, 1 Mason, 182, 188, Fed. Cas. No. 8,568;  2 Rob. Pat. § 489.

In The Corn-Planter Patent, supra, Mr. Justice Bradley, delivering the opinion of the court, said:

"If the patentee by his specification, including the summary claim at its close, points out and distinguishes what he claims as his own invention, it is all that is required."

Reference is made by both parties to certain interference proceedings claimed to sustain their respective positions on the question whether all the claims of the process patent in suit require a mixture or commingling of the resistance material with the material to be treated.   No alleged interference, on the merits of which the patent office finally passed and to which the Messrs. Cowles were parties, was declared until after the issuing of the process patent in suit, and cannot of itself control the scope, construction or validity of the claims in question.  2 Rob. Pat. § 588.   These interference proceedings can at most only serve to disclose the understanding of the patent office and of the parties to such interference at the time as to the validity and scope of those claims. They are not conclusive in any sense upon the rights of the appellant.   An interference was declared November 5, 1886, between an application by Camille A. Faure for "Smelting or Reducing Substances by Means of Electricity," filed May 10, 1886, the patent of Bradley & Crocker, of February 2, 1886, No. 335,499, for "Process of Heating and Reducing Ores by Electricity," the patent of Cowles & Cowles, of August 18, 1885, No. 324,658, for "Electric Process of Smelting Ore for the Production of Alloys, Bronzes, and Metallic Compounds," and the process patent in suit.   The issue in interference was thus stated:

"The improved pyro-electric process for metallurgical operations, which consists in placing the material or mixture to be treated in contact with an electric conductor and causing an electric current to flow through said conductor and the material or mixture, whereby they are highly heated and the desired operation effected."

This interference was dissolved at the instance of the Messrs. Cowles on the ground of the non-patentability of the subject-matter as set forth in the issue. The issue clearly was too broad. It did not define the nature of the electric conductor. It was broad enough to cover a solid or compact conductor as well as one consisting of a discrete or granulated body, but it did not specifically refer to the production of heat by the passage of an electric current through a discrete mass of resistance material from granule to granule. The issue in view of the prior art did not constitute the subject of a valid claim. The fact of the dissolution of the interference at the instance of the Messrs. Cowles tends to support the contention of the appellant that the use of a granular resistance body and not a solid or compact body as the electric conductor is an essential feature of its process. Nor did the action of the Messrs. Cowles operate to preclude them from insisting upon the scope and validity of their patent as covering patentable features included in the issue. Subsequently two interferences were declared between the above mentioned application by Faure and the process patent in suit; and in each case judgment of priority of invention was rendered in favor of the Messrs. Cowles September 9, 1889. The interference proceedings were protracted and somewhat complicated, and it is unnecessary and would be profitless to discuss them in detail. We have, however, carefully and fully considered them and find in them no evidence that the patent office regarded the process patent in suit, in contravention of its plain terms, as confined to a process involving an intimate mixture of resistance material with the material to be treated. The evidence, indeed, points the other way. In view of the language of the claims of the patent, the description read in connection with the claims, the proceedings in the patent office on the application for that patent, and the interference proceedings involving it, we hold that the patent is not restricted in claims 1, 2 and 4 to a mixture of the resistance material with the material to be treated, but so far as those claims are concerned contact merely between the two is required.

The granting of the process patent in suit carries with it the presumption of its validity. The answer sets up numerous prior patents, publications and other alleged anticipatory matter, which the appellee contends discloses the subject-matter of the several claims; and the appellee further contends that, even if the claims cover or include any patentable subject-matter, they must in view of the prior art be restricted to only one form of contact between the resistance material and the material to be treated, namely, an intermixture or commingling of the two. We think that neither of these contentions can be sustained. Probably the most relevant patent referred to by the appellee is No. 236,478, granted January 11, 1881, to Ball & Guest for

an "Improvement in Electrical Carbonizing Apparatus." The invention is thus stated:

"Our invention relates to an apparatus for carbonizing arcs of paper or other materials or articles by the direct application of an electric current to such materials or articles while confined in a case or muffle of non-conducting material."

It is true that in the process disclosed in the Ball & Guest patent an electric current passed through a discrete body of resistance material consisting of pulverized carbon in contact with the paper or other material to be carbonized whereby heat was generated sufficient to conduct the desired operation. But it is admitted by counsel for the appellee that this process is different from the process of the patent in suit in that the former "treats a different material and obtains a different product." It does not suggest a process for reducing ores and highly refractory compounds on any considerable scale, or, indeed, the generation or application of heat for metallurgical purposes at all. The two patents do not relate to the same art nor has the doctrine of analogous use any application as between the processes described therein. Potts v. Creager, 155 U. S. 597, 15 Sup. Ct. 194, 39 L. Ed. 275. The Ball & Guest patent was cited in the patent office against the application of the Messrs. Cowles, but was decided not to negative their right to a monopoly in the subject-matter of their claims as finally allowed. There can be no doubt on the evidence that prior to the process patent in suit metallurgical operations had been performed through the instrumentality of the electric arc, electrical conductors consisting of wires or rods of metal or of other solid or concrete bodies, or by electrolysis. But on careful examination we have failed to find in any patent, publication or other matter alleged as an anticipation or as showing the prior art, a practical process for metallurgical or analogous operations involving the use of a discrete body of conductive but resistant material rendered incandescent by the passage of an electric current and mixed or otherwise in contact with the material to be treated. This is the broad, underlying idea of the process patent in suit, and is well covered by its claims. The Messrs. Cowles were the first to invent and use this process and the patent must be sustained. It is a meritorious one and its claims are entitled to considerable liberality of construction.

We now take up the question of infringement. In the description it is stated:

"The operation must necessarily be conducted within an air-tight chamber or in a non-oxidizing atmosphere, as otherwise the carbon will be consumed and act as fuel. The carbon acts as a deoxidizing agent for the ore or metalliferous material treated, and to this extent it is consumed, but otherwise than from this cause it remains unimpaired."

The appellee contends that this alleged requirement must be read into the claims and that such limitation of the claims excludes infringement. Assuming that the employment of an "air-tight chamber" or a "non-oxidizing atmosphere" is an essential element of the patented process and is not specified merely by way of recommenda-

tion of the most economical and profitable mode for conducting the process, the question arises whether the defendant's process in the production of carborundum is not carried on in a non-oxidizing atmosphere. Such an atmosphere is one which is necessarily present in the interior of a large mass of highly heated carbon. The appellee in its process maintains a non-oxidizing atmosphere in and about the zone of reduction. The atmosphere, with respect to its non-oxidizing quality, is practically the same in each case within the sphere of the operation carried on. As has been stated, silicon—a metalloid— must be treated as a metal within the scope and terms of the process patent in suit, and the reduction of oxide of silicon is therefore to be considered, for the purposes of this suit, a metallurgical operation. No liberality of construction is required to show that the defendant's process infringes some, if not all, of the claims of the patent in suit according to their literal import. Claim 1 is as follows:

"(1) The method of generating heat for metallurgical operations herein described, which consists in passing an electric current through a body of broken or pulverized resistance material that forms a continuous part of the electric circuit, the ore to be treated by the process being brought into contact with the broken or pulverized resistance material, whereby the heat is generated by the resistance of the broken or pulverized body throughout its mass, and the operation can be performed solely by means of electrical energy."

The appellee passes an electric current through a body of pulverized resistance material, namely, the carbon core, which forms a continuous part of the electric circuit; the ore, namely, oxide of silicon, to be treated by the process is brought into contact with the pulverized resistance material, namely the carbon core, whereby heat necessary to produce the desired effect in the ore is generated by the resistance of the pulverized body, namely, the carbon core, throughout its mass, and the operation can be performed solely by means of electrical energy.

Claim 2 is as follows:

"(2) The method of smelting or reducing ores or metalliferous compounds herein described, which consists in subjecting the ore in the presence of carbon to the action of heat generated by passing an electric current through a body of broken or pulverized resistance material that forms a continuous part of the electric circuit, the ore being in contact with the broken or pulverized resistance material, whereby the ore is reduced by the combined action of the carbon and of the heat generated solely by the resistance of the broken or pulverized body throughout its mass."

The appellee subjects the ore, namely, oxide of silicon, in the presence of carbon in the charge mixture, to the action of heat generated by passing an electric current through a body of pulverized resistance material, namely, the carbon core, which forms a continuous part of the electric circuit, the ore, namely, that part of the charge to be acted on, being in contact with the pulverized resistance material, namely, the carbon core, whereby the ore, namely, oxide of silicon, is reduced by the combined action of the carbon in the charge and the heat generated by the resistance of the pulverized body, namely, the carbon core throughout its mass.

Claim 4 is as follows:

"(4) The method of smelting or reducing ores or metalliferous compounds herein described, which consists in subjecting the ore in the presence of a re-

ducing agent to the action of heat generated by passing an electric current through a body of broken or pulverized resistance material that forms a continuous part of the electric circuit, the ore being in contact with the broken or pulverized resistance material, whereby the ore is reduced by the combined action of the reducing agent and of the heat generated solely by the resistance of the broken or pulverized body throughout its mass."

The appellee subjects the ore, namely, oxide of silicon, in the presence of a reducing agent, namely, carbon in the charge mixture, to the action of heat generated by passing an electric current through a body of pulverized resistance material, namely, the carbon core, which forms a continuous part of the electric circuit, the ore being in contact with the pulverized resistance material, namely, the carbon core, whereby the ore is reduced by the combined action of the reducing agent and of the heat generated by the resistance of the carbon core throughout its mass. In the view we take of this case it is unnecessary to decide the question, much debated by counsel, whether the appellee's process infringes claim 3 of the process patent in suit either literally or substantially. We have no doubt on the evidence that carborundum can be and has been produced under the process covered by any one of the claims of the process patent in suit, although not so efficiently or profitably under the method of claim 3. So long ago as 1884 the Messrs. Cowles produced it under their process with and without the use of a prepared or pre-formed central core of resistance material. It is true they did not manufacture it for commercial purposes and, failing to appreciate its importance, though aware of its abrasive qualities, applied their process to other branches of metallurgy. The appellee manufactures carborundum under a process described in patent No. 492,767, granted to Edward G. Acheson February 28, 1893, and a reissue patent No. 11,473, granted to him February 26, 1895, for an "Improvement in the Production of Artificial Crystalline Carbonaceous Materials." In the description of the reissue, as well as in that of the original patent, Acheson states:

"I have found by experience that as a carbonaceous material, ordinary coke produced from bituminous coal, or gas coke carbon, natural or artificial, give good results, and the more nearly pure it is, the more satisfactory are the products. This carbonaceous material is reduced to a proper state of subdivision and mixed with a proper proportion of silica, silicate or alumina or equivalent, and preferably with a flux such as common salt, when the whole mass is properly sub-divided and mingled thoroughly together. I then subject the mixture to a high degree of heat and preferably make use of what may be termed an electrical furnace. Any suitable furnace may be used which is capable of withstanding the proper degree of heat and the mixture is placed in the furnace in such a manner as to allow the current of electricity to be passed through the mass of material. Owing to the relatively high resistance of the mass when first introduced into the furnace, I find it sometimes desirable to facilitate the passage of the current through the mass by introducing conducting material, preferably by forming a core of such conducting material through the mass," &c.

In the description of the reissue patent he also adds:

"As between working the process with a core and without, the former, that is, working with a core, is believed to be the best."

Here is the clearest recognition by Acheson that carborundum may be produced with or without the use of a core of resistance material. And Acheson confirms this point by his testimony. It is true that the

appellee in practice has adopted a central core as the best method of conducting its process, and that the appellant has adopted a mixture without a central core as the best method of conducting the process of the patent in suit. But the use of the central core of resistance material is within the process of the appellant under claims 1, 2 and 4. These claims require merely contact in contradistinction to a mixture between the resistance material and material to be treated, and it is immaterial whether, under those claims, the body of resistance material assumes the form of a central core or any other shape, so long as it is in contact with the material to be treated, is discrete, granular or pulverized in its composition, is rendered incandescent through the passage of an electric current through its mass or over its area, and thereby affords the heat to effect the desired end. It has been urged that the object of the process patent in suit is reduction, while that of the appellee is composition. But the first and essential step of the process of the appellee involves reduction. The oxide of silicon is necessarily reduced before atoms of silicon can unite with atoms of carbon and form carborundum. The manufacture of carborundum as carried on by the appellee necessarily includes the practice of the broad process of the appellant; and infringement of the patent in suit is not avoided by the fact that after the reduction of the oxide of silicon, the atoms of that metalloid unite with those of carbon to form carborundum. Much has been said on the subject of electrolysis. The appellee claims that its process is not electrolytic, while the process covered by claim 3 of the process patent in suit is. We think that while there may be some electrolytic action in the latter, it is merely incidental to the process and does not in any manner constitute its distinguishing feature, which is the transmission of heat to the material to be treated from the granular or pulverized resistance material rendered incandescent by the passage of the electric current. But whether the process as conducted under claim 3 does or does not involve electrolysis to a limited degree becomes a wholly immaterial inquiry in view of the fact that claims 1, 2 and 4 cover methods of process to which electrolytic action can no more be attributed than it can to the appellee's process. We shall not further pursue this branch of the case. We are satisfied that the appellee has infringed claims 1, 2 and 4 of the process patent in suit.

The apparatus patent in suit, No. 319,945, contains seven claims. The charge of infringement with respect to this patent must in view of notice by the counsel for the appellant, during the taking of the evidence, that reliance was placed on claims 1 and 2, and not on the remaining claims, be treated as confined to those two claims. They are as follows:

"(1) In an electric smelting or reducing apparatus a chamber or casing having its longest dimension in a horizontal direction, and adapted to contain a charge of ore and electrical resistance material previously pulverized and mixed together, the oppositely-located electrodes in conductive relation to the charge, but otherwise insulated from one another, and an exit for the escape of the gases and vapors evolved from the charge during the process of reduction, substantially as herein set forth.

"(2) In an electric smelting or reducing apparatus the smelting chamber formed of side and bottom walls of closely-packed pulverized or granular mate-

rial and the permeable top wall formed of a layer of granular non-heat-conducting material, and the electrodes oppositely located at the ends of the core or smelting-chamber, substantially as herein set forth."

We do not find any anticipation of the apparatus patent or anything to affect its validity. The question is solely one of infringement of claims 1 and 2. While the process of producing carborundum as practiced by the appellee infringes claims 1, 2 and 4 of the process patent in suit, we do not think that the appellee has infringed either the first or the second claim of the apparatus patent in suit. These two claims, read in the light of the specification, evidently relate to apparatus adapted to the carrying on of the appellant's process in the usual and preferable manner, namely, where the resistance material and material to be treated are intermingled and not otherwise in contact. We therefore hold that the appellee has infringed claims 1, 2 and 4 of the process patent in suit, but has not infringed either claim 1 or claim 2 of the apparatus patent in suit.

The decree of the Circuit Court is reversed with directions to enter a decree for the complainant in accordance with this opinion but without costs, heretofore incurred, to either party.