R. THOMAS & SONS CO. v. ELECTRIC PORCELAIN & MFG. CO. et al.

(Circuit Court, D. New Jersey. November 11, 1901.)

1. PATENTS—INVENTION—ELECTRICAL INSULATORS.

The Boch patent, No. 600,475, for an electrical insulator and method of making same, describes a porcelain insulator for use with high-tension conductors, made, according to the process shown, in two or more separate parts or shells molded so as to nest or fit into each other, and which when dried are coated with glaze, placed together with the open side up, and extra liquid glaze poured into annular channels provided to receive it between the parts. When placed in the oven for firing in this position, the extra glazing material melts, and flows down as the clay shrinks, and fills the spaces and any crevice or crack which may form in the process of firing. *Held*, that while neither the making of insulators in parts fitted into each other, nor the uniting of such parts by glazing, was novel, the combination of them with the further step of supplying an extra amount of liquid glaze sufficient to not only fuse the parts into a whole, but to fill all crevices, the result being a superior article, constituted invention, and was not anticipated by anything in the prior art. Such patent also *held* infringed.

2. SAME—ANTICIPATION.

An unsuccessful and abandoned experiment does not operate as an anticipation, particularly where it involved no use or discovery of the process or product subsequently invented, however close it may have come to doing so.

3. SAME—PRIORITY OF INVENTION—INTERFERENCE PROCEEDINGS—ACCESS TO FILES.

Semble, where interference proceedings are declared between two different applications for a patent, it will not be presumed that one applicant derived anything from the other, merely because of having access under the rules of the patent office to the other's files.

4. SAME—PATENTABILITY—ESTOPPEL.

While the defendant in infringement proceedings may not be estopped from contesting the question of patentability, because of his having himself applied for the same identical patent, it does not come with good grace for him or his assigns to do so.

5. SAME—NEW RESULT.

While the application of an old process to a similar or analogous subject, with no change in the manner of the application, and no result substantially distinct in its nature, will not sustain a patent, even if the new form of result has not before been contemplated, yet, if a new

combination and arrangement of known elements produce a new and beneficial result never attained before, it is evidence of invention as a general rule.

**6.** SAME—PRIORITY OF INVENTION—CONCLUSIVENESS OF DECISION IN INTERFERENCE PROCEEDINGS.

Where the question of priority of invention between two applicants for patents for the same article or process has been determined in interference proceedings in the patent office, and especially where the decision of the commissioner has been affirmed on appeal by the court of appeals of the District of Columbia, such decision is conclusive between the parties, at least when no new evidence is adduced, and the question will not be reopened.

In Equity.  Suit for infringement of patent.  On final hearing.

The following cuts and extracts from the specification illustrate the Boch insulator, and the process of its manufacture:

FIG. 1.

FIG. 2.

"In the accompanying drawings, Fig. 1 is a sectional view illustrating one step in the manufacture of my improved insulator. Fig. 2 is a sectional view of a finished insulator. In the drawings I have shown a triple petticoat type of insulator, but my invention may be employed in the manufacture of double petticoat insulators or other styles. The insulator is built up of two or more separately molded parts of clay. In the case of the triple petticoat style of insulator it is preferred to make it of three separately molded pieces of clay. The inner part, A, is pressed or molded with a threaded or other suitable socket, a, for the reception of the usual pin of iron or other suitable material, and the outer part, C, shaped like an inverted bowl, is provided with a cross notch, c, on the top for the reception of the electrical conductor, and has side shoulders, c′, c′, by which the conductor may be wired down. The intermediate part, B, is made bowl-shaped, and the several parts are molded so as to nest or fit into each other in the manner shown, preferably with corresponding centering projections and recesses, x, x. In carrying out my invention, the separately molded parts, A, B, C, after coming from the press, are first dried out separately. This is preferably done in an oven or kiln in the usual manner of drying clay articles by the process known as 'biscuit firing.' When these separate parts have thus been biscuit fired or otherwise dried, and are ready to be put into the vitrifying kiln, they are each coated with a glazing material, preferably all over, as by dipping the article into such liquid glazing material. The two or more parts of each insulator thus coated are now fitted into each other, and are stood upside down, as it were; that is, with the lower ends of the bowls uppermost, as shown in Fig. 1. Glazing material is then put into the joints, —that is, into the annular channels between the petticoats,—and this may be most conveniently done by pouring the liquid glaze into the channels, as indicated at y, in said figure. The parts thus put together and supplied with glazing are now put into a sagger, with the petticoats uppermost, as shown in Fig. 1, and placed in a kiln, in which, under great heat, the clay shrinks and becomes vitrified, as usual, and the glazing material melts and becomes of a glass-like character. That glaze which was put into the annular channels between the petticoats flows down into and fills all the spaces between the parts of the insulator; such spaces either being there by lack of correct fit of the parts, or arising during the shrinkage by the vitrifaction of the clay. The result is that the two or more separately molded parts are firmly united to each other throughout by means of the glass-like glaze. Owing to the supply of the extra glazing material between the petticoats or at the joints, I prevent the formation of air spaces or cracks for the entrance of moisture in the finished insulator, and which are almost certain to occur in the absence of such provision of additional glazing material. A solid and practically impenetrable layer or layers of glaze will thus be formed between the conductor and the supporting pin intermediate between the porcelain or earthenware parts of the insulator."

Hubert Howson, for plaintiff.
Howard P. Denison, for defendants.

ARCHBALD, District Judge.[1]  The defendants do not dispute that there has been an infringement, if the patent in suit is a valid one; but they deny that it is, on the ground that it has no novelty, and that the process involved in it is not patentable, and, if these be found against them, they further assert that Locke was the real inventor, and not Boch, under whom the plaintiff claims. The patent is for a high-tension porcelain electric insulator, manufactured according to a specified method, as set forth in letters patent issued to John W. Boch, March, 1898, on an application filed Octo-

[1] Of Middle district of Pennsylvania, specially assigned.

ber 23d previous. Porcelain is recognized as the best resisting material, but the difficulty is to keep it free from flaws and imperfections which make it puncturable. Where there is a high voltage, the tendency of the electric current is to arc, especially in wet weather, by seeking out any existing defects in the insulating material, and to prevent this the greatest care has to be exercised to see that there are no cracks or flaws where dust and dampness can get in, and there is the least likelihood of this where the porcelain is baked in thin pieces. Acting on this idea, the Boch insulator is made up of two or more bowls or shells, molded so as to nest or fit into each other, being calculated in this shape to vitrify as perfectly as possible; and, in order to weld them into one, they are fitted together upside down, and liquid glaze poured into the cup-like spaces or channels provided to receive it in between, and upon being put in the oven in this position the glazing material flows down as the clay shrinks, not only filling up the joints, but penetrating into whatever cracks or crevices may form in the process of firing, and at the same time cementing and solidifying the parts into a single mass, so as to stand the requisite high mechanical strain. It is this process and the resulting product that the patent in suit is intended to cover and protect.

There is no novelty in an insulator made up of separate parts fitted into each other, whether of the same or different material. This appears in the Varley English patent (1861), the Johnson & Phillips (1878), the Pass and Seymour Cuban insulator (1892), the Hauty (1893), the Locke (1896), and the Locke Cornell two-part insulator of February, 1897. Neither does fusing the two parts together add anything. Admittedly this is an ordinary process in pottery, which is exemplified in the N. Boch door knob (1875), the Geery mantle (1879), and the Anderson irrigating tile (1886). In the Locke insulator of February, 1897, also the shells were to be fused into one.

But the novelty claimed for the patent in suit consists not in these things alone, but in a combination of them, with the other and further step of supplying an extra amount of liquid glaze, sufficient not only to fuse the separate parts into a single whole, but to so fuse them that all the cracks and crevices which exist or may arise in the process of firing shall be completely closed and filled. This is secured, as already said, by turning the parts with the petticoats up, and thus providing a receptacle or reservoir to hold the glazing material, and conduct it down in between the porcelain shells as they are being fired. In other words, it is not so much the fusing as the particular manner of doing so, and the results thereby obtained, that constitute the invention; and this, in my judgment, has not been anticipated by anything found in the prior state of the art.

The Dinsmore experiment comes the nearest to doing so. About the middle of January, 1897, Locke sent to the Imperial Porcelain Works, a firm doing business at Trenton, blueprints from which to have some two-part insulators constructed. Mr. Dinsmore, one of the firm, had dies cut out according to the patterns so given him, and insulators molded from them, somewhat in the annexed form:

And, after having dried and biscuit fired them, the shells were separately dipped in glaze, and fitted into each other for the final burning. In a few instances, Mr. Dinsmore, finding the inner piece too small, thought he would try whether, by putting in some extra glaze, he could not keep it central, and prevent it from tipping, but the results were not satisfactory. When the insulators were put into the kiln, with the petticoats up, the glaze, with its natural shrinkage, flowed down into the bottom between the two shells, leaving a considerable space unfilled between them. And in those cases where the petticoats were turned down the glaze flowed out, and left the space almost entirely empty. About 150 of these insulators were made for Locke at this time, but only a few were delivered to him, because he did not pay for them. Whether any of those delivered were of the extra glaze experimental lot does not appear. The rest were never put in use or sold, and were ultimately broken up, and consigned to the scrap heap. Locke tries to claim the benefit of this experiment, whatever it was, and asserts that it was conducted according to his instructions. But Dinsmore denies that Locke had anything to do with it, and says that what he did was entirely his own idea, and in this he is confirmed by his partner, Duggan, as well as by the general circumstances. At all events, it was not followed up, and nothing came of it, and, what is still more to our purpose, it did not produce a glaze-filled insulator such as the one in suit, nor was it calculated to do so.

This unsuccessful and abandoned experiment does not operate as an anticipation of the present patent. Deering v. Harvester Works, 155 U. S. 286, 15 Sup. Ct. 118, 39 L. Ed. 153. It involved no use or discovery of the process or product invented by Boch, however close it may have come to it. Dinsmore's whole effort, as we have seen, was directed to steadying the inner shell so that it would fuse true. He had no conception of supplying extra glaze to flow in and fill the

cracks and interstices left in baking. And neither the form of the shells nor the course taken with regard to them would have done so. He turned them, indifferently, up or down, and, even if the shells had been kept upright, their form, and the close way in which they fitted together, provided no receptacle to hold the glaze, and conduct it in, as the parts contracted in firing, which is an essential feature of the Boch process. Not only, therefore, did nothing practical come of the experiment, but nothing involved in the patent in suit is found in it, except the single circumstance that there was an attempt to fuse the parts with extra glaze, which falls far short of that which we have here.

Equally futile is it to assert that the rejected Locke application of February 5, 1897, was a prior publication as to Boch, which disclosed to him, as well as anticipated, what he has since put in shape. This, in a way, is a new phase of the old question of priority decided adversely to Locke in the second interference proceedings, if it is not, indeed, an attempt to reopen it. Passing by that feature, however, for the moment, there is no merit in it, independently considered. While it is true that when in September, 1897, the two applications of Locke and Boch were thrown into interference, Boch had access, under the rules, to Locke's files, yet there is nothing to show that he derived anything from this opportunity, nor, indeed, do I see how he could. To reach that conclusion, I must hold that the Locke application virtually embodied the present invention, and that is really the argument which is made for it. The process there described, it is said, calls for fusing; and in the diagram which accompanies it, by a heavy black line between the two parts of the insulator where the fusing is to take place, the use of extra glaze it is claimed is shown, thus anticipating Boch's use of it, and suggesting it to him, as is proved by his application of October 23d, immediately following. To this, however, there are several things to be said. In the first place, I am far from persuaded that Locke's application really shows extra glaze. Admittedly it says nothing about it, and Locke himself swears, in the course of the interference proceedings referred to, that he did not disclose to his attorneys, when giving them instructions for the 1897 application, that he filled the space between the two shells with extra glaze for the purpose of fusing them together, thus showing, to say the least, that it had no great prominence in his mind. He explains the omission by saying that he did not consider the fusing with glaze patentable, but that does not do away with the effect of omitting it. And, if his first application covered the subject, why was it necessary for him to make a new and independent one, as he did in 1898, when he discovered that Boch had obtained the patent in controversy? It is contended, however, that Locke shows extra glaze, even if he says nothing about it; this being indicated, as claimed, by the heavy black line between the shells. But in the specification of his invention the black line which is now relied upon is declared to represent simply the fusing together of the two parts of the insulator, or, to quote his own words, in describing the process of manufacture, "The two insulators are again put into the kiln and fused together, as shown by the dark line, c." Furthermore, in

the blueprint sent to Dinsmore, which must be taken as an original, the apparent extra thickness of the line between the inner and outer shell is plainly due to the lines having run together in printing, the two at several points being distinctly separate.

But even assuming that all this is not so, and that Locke's application really discloses, in the way he contends, the use of extra glaze for the purpose of fusing, the whole argument that Boch got his ideas from it, and that as to him it amounts to a prior publication, is built up on the theory that the patent in suit is one for extra glaze only, or essentially. This, it must be apparent from what has already been said, falls far short of a true apprehension of it. It is not alone for that, although that is involved in it, but for the whole process by which the glaze is supplied, including the exact manner of supplying it, and this could not possibly be gleaned from anything in Locke's application which has no suggestion of it.

But, as intimated a moment ago, the argument with regard to the Locke application is no more than a specious attempt to reopen the question of priority, which was decided adversely to Locke in the second interference proceedings. Those proceedings did not end with the decision of the commissioner of patents, but were carried to the court of appeals of the District of Columbia. Had they stopped short of this, and rested with the hearing before the commissioner, his decision of itself would have had to be accepted as controlling, in the absence of evidence carrying thorough conviction to the contrary. Morgan v. Daniels, 153 U. S. 120, 14 Sup. Ct. 772, 38 L. Ed. 657. Much more is this effect to be given to it when it has been confirmed, as it has, by the judgment of the court of appeals. Whether this made it res judicata or not I do not need to determine. It is sufficient to hold that with no new evidence adduced the question of priority in all its forms and phases is concluded between the parties, and will not be reopened.

As to the question of patentability, which is the only thing left, while Locke, or those claiming under him, may not be estopped from contesting it, yet, considering that Locke himself endeavored to obtain a patent for the same identical process, copying the Boch application verbatim, it does not come with good grace for him, or his assigns, to do so. Shuter v. Davis (C. C.) 16 Fed. 565. He also virtually affirmed to its patentability in the affidavits of Cahoon and himself, presented to the court of appeals in the first interference proceedings. But passing all this by, and laying no especial stress, as we might, on the fact that the patent office has pronounced in its favor and allowed the patent, why does it not embody a patentable process and product? The defendants contend that the commissioner of patents and the court of appeals of the District of Columbia have both decided in the first interference proceedings that it did not. But Locke's application was the only thing involved in those proceedings, and it was that alone that was passed upon. The fusing there spoken of, it was held, must be regarded as the ordinary process by slip or glaze, which, being such as any potter would employ, was not patentable. In the Boch patent, however, while the fusing by glaze is made use of, it is a special, and not an ordinary, use, and there is

111 F.—59

the difference. The process is of such a character, take it all in all, as would not be in the mind of the ordinary potter, but needed the genius of an inventor to devise and suggest. It consists, as we have already seen, in so arranging the several parts of the insulator, and giving them such form, that a receptacle or reservoir is provided between each set, into which, the petticoats being turned upward, the extra glaze is put, in such sufficient quantity that when the whole is fired it will flow down into the intervening spaces, and completely fill them, as well as any other crevices or intervals which may occur in firing. This is something which up to that time no one had thought of or employed. If it was the use of an old process, it was its use under new conditions, and in such combinations as to produce new and extraordinary, as well as highly satisfactory, results, the success of which, where others failed, has no little to do in proving its novelty and value. While it is true, as declared in Pennsylvania R. Co. v. Locomotive Engine Safety-Truck Co., 110 U. S. 490, 4 Sup. Ct. 220, 28 L. Ed. 222, that the application of an old process or machine to a similar or analogous subject, with no change in the manner of the application, and no result substantially distinct in its nature, will not sustain a patent, even if the new form of result has not before been contemplated, yet the very exception there recognized is to be found in the case before me, for a substantial and distinct result has in fact been attained. We may better apply the words of Mr. Justice Bradley in Loom Co. v. Higgins, 105 U. S. 580, 26 L. Ed. 1177, that "it may be laid down as a general rule, though perhaps not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention,"—a principle which has been recognized in numerous subsequent cases. In my judgment, the present falls fully within it, and is therefore to be sustained.

Let a decree be drawn affirming the validity of the patent, appointing a master, and directing an account.

The defendants thereupon applied for and obtained a reargument on the ground that the fourth claim of the patent, being for a product, was not patentable, the same being capable of being produced by other processes, and particularly could not be included in one and the same patent with claims for the process by which it was produced.

(December 26, 1901.)

ARCHBALD, District Judge. I am not persuaded by the reargument that any mistake was made in sustaining the Boch patent in its entirety,—not only the process specified in the first three claims, but the product covered by the fourth as well. The truth is it is the product that is the important thing, rather than the process by which it is brought about, although that devised by the inventor seems peculiarly well calculated to produce it. In considering the invention, regard must be had to the difficulties to be overcome and the purposes to be accomplished in view of the prior state of the art. As already pointed out in high tension insulators, the greatest care has to be taken to keep the porcelain free from flaws and imperfec-

tions, and this is best done by molding and baking it in thin parts, and then welding the parts together. But by the ordinary processes this is but imperfectly effected at the best, and, even when fused with glaze, that a perfect union will be brought about, so that the whole shall be one solid mass, cannot be implicitly relied upon. The most that can be hoped for is one which will meet the mechanical strain to which the insulator is likely to be liable. But this fulfills only a part of the requirements. It does not provide for the cracks or flaws which may occur in the porcelain itself in firing, or the gaping of joints or the misfitting of parts due to shrinking, imperfect molding, or displacement. It was a distinct advance in the art, therefore, to overcome this difficulty and produce an insulator which, molded and baked in thin pieces, should be fused into one solid mass, with the flaws, joints, and imperfections at the same time taken care of; and it is with an insulator of this character, made practically impuncturable, that the electric world is particularly concerned. It does not matter to them by what process such an insulator is made. It is the product that they are after. This product, as a new and useful article of manufacture, the inventor is entitled to patent and protect. Nickel Co. v. Pendleton (C. C.) 15 Fed. 746, 21 Blatchf. 226; Badische Anilin Soda Fabrik v. Kalle (C. C.) 94 Fed. 175. And that is what we have here. Boch has conceived and perfected that which others had striven for in vain. Characterized in a phrase, his invention may be spoken of as a glazed-filled multipart porcelain insulator. Its particular features have already been adverted to. The process he employs and has patented seems peculiarly fitted to accomplish the end desired, but the fact that there may be others does not debar him from laying claim to the result attained, of which he seems to be the discoverer. There is nothing in the law that I can see to interfere with this. It is no doubt true that an inventor who devises a new process cannot patent the product, simply because it is a result of that process, if it is not itself also new. Rob. Pat. § 519. But that, as I understand it, is as far as the restriction goes. There is nothing to bar the patenting of the product, as well as the process, if both are new, and especially if one is the peculiar result of the other. Nor does there seem to be anything to prevent both being embraced in one and the same patent. The rule which prevailed at one time in the patent office to the contrary has been changed.

Finding no error, therefore, in my former conclusions, the case will proceed to a master as heretofore ordered.