## NAYLOR et al. v. ALSOP PROCESS CO.†

(Circuit Court of Appeals, Eighth Circuit. April 3, 1909.)

No. 2,808.

1. PATENTS (§ 21*)—INVENTION—PROCESS.

The mere selection of one substance from among a number as the active agent in a chemical process may involve patentable invention.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 23; Dec. Dig. § 21.*]

2. PATENTS (§ 66*)—ANTICIPATION—PRIOR PATENTS.

When it is sought to ascertain the state of the art by means of prior patents, nothing can be used except what is disclosed on the face of those patents. They cannot be reconstructed in the light of the invention in suit, and then used as a part of the prior art.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 66.*]

3. PATENTS (§ 55*)—ANTICIPATION—PRIOR PATENTS.

An expert cannot take a process patent, which has never been applied industrially, and work the process in his laboratory, and discover therefrom something which is not disclosed on the face of the patent, and then transfer that experience back to the time of the patent, and make it a part of the prior art, for the purpose of defeating a subsequent patent for a meritorious invention.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 74; Dec. Dig. § 55.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
† Rehearing denied June 14, 1909.

4. PATENTS (§ 328*) — VALIDITY AND INFRINGEMENT — PROCESS OF BLEACHING FLOUR.

The Andrews patent, No. 693,207, for a process for aging and bleaching flour, which consists in passing the same in a state of fine division through an atmosphere containing a small regulated quantity of gaseous nitrogen peroxide, was not anticipated in the prior art, and discloses both novelty and invention, and in the absence of evidence that the process results in an adulteration of the flour, or is used for the purpose of fraud, must be conceded utility, it being conceded that it whitens the flour without the necessity of aging as previously required; also *held* infringed.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

Appeal from the Circuit Court of the United States for the District of Nebraska.

George P. Barton, Dewitt C. Tanner, and George E. Folk, for appellants.

Livingston Gifford, George W. Rea, and Bruce S. Elliott, for appellee.

Before SANBORN and VAN DEVANTER, Circuit Judges, and AMIDON, District Judge.

AMIDON, District Judge. This is a suit in equity, brought by the Alsop Process Company, to restrain the infringement of letters patent No. 693,207, granted to John and Sidney Andrews, February 11, 1902, on an application filed September 21, 1901, for a process of bleaching and conditioning flour. The complainant prevailed below. It had long been known that flour immediately after grinding, especially if produced from newly grown wheat, was unfit for domestic use. Storing the flour for about three months was necessary in order to whiten its color and otherwise improve its condition. The patentees claim to accomplish these results immediately by their process. In their specification they state that:

"The invention consists essentially in subjecting the flour to the action of a suitable gaseous oxidizing agent, whereby nascent oxygen, or its equivalent, is produced, or comes in contact with the flour. A very small quantity of the oxidizing agent suffices, so little, indeed, that the actual composition of the flour, as shown by analysis, is hardly perceptibly altered. The plan we prefer is to pass the flour through various conveyors whereby it is brought in contact with the gaseous oxidizing agent, and the drawings we herewith append show the apparatus which from long experience we have found to act best with air carrying a small quantity of gaseous peroxide of nitrogen ($N_2O_4$). We do not, however, limit ourselves to the use of nitrogen peroxide, as we have found that chlorine, bromine, and other gaseous compounds capable of liberating oxygen will act with more or less efficiency."

They then expressly disclaim ozone and sulphuric and sulphurous acid, for reasons stated. Claim 1 of the patent, as originally presented, read as follows:

"The improvement in the process of aging and bleaching flour, which consists in thoroughly and uniformly exposing the same to a medium capable of giving nascent oxygen to the flour, substantially as described."

Claim 3 was framed so as to substitute for "nascent oxygen" "a dilute, gaseous, or vaporized oxidizing agent." The application was

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

rejected, and the inventors were required to bring their claims "down to the actual invention." In obedience to that requirement the claims were framed as they now appear in the patent. Claim 1 reads as follows:

"The improvement in the process of aging and bleaching flour, which consists in passing the same in a state of fine division through an atmosphere containing a small regulated quantity of gaseous nitrogen peroxide."

Claim 2 is substantially the same, while claims 3 and 4 simply embrace well-known methods of producing nitrogen peroxide by a combination of nitric acid and ferrous sulphate, or other recognized metallic compounds. The patent, therefore, both by its language and by what occurred while it was pending before the patent office, is confined to nitrogen peroxide as its chemical agent, and any other chemical agent, if any such exist, so well known to accomplish the same result as to make it an equivalent of nitrogen peroxide within the rules of patent law. It will be noticed that the specifications are much broader than the claims, and in such a case it is now elementary that the claims measure the scope of the patent.

There are two well-known methods of producing nitrogen peroxide. The one is chemical, by combining nitric acid with a metallic compound, like sulphate of iron. The other is electrical, and is accomplished by subjecting atmospheric air to a flaming electric arc. The Andrews patent was first granted in England, where the inventors reside, and pointed out, as already stated, the chemical method of producing nitrogen peroxide. In 1904, a patent was issued to James N. Alsop, in the United States, for a process which accomplished in flour the same results as the Andrews process. The agent claimed by Alsop was the gases generated by subjecting air to a flaming electric arc. In his patent he does not attempt to name such gases, and it probably was not known to him at the time that nitrogen peroxide was his active agent. The Andrews process went into immediate and extensive use in the flour mills of Great Britain. No attempt was made to introduce it in this country. Here, immediately after the taking out of the Alsop patent, that process was extensively applied industrially. The Alsops also took out a patent for their process in Great Britain, and by 1906 the two processes came in conflict before the industrial world. In that year the Alsops instituted a suit in the English courts for the revocation of the Andrews patent, claiming, among other things, that it was void for want of novelty, invention, and utility. This litigation has resulted in decisions by the Court of Appeals and the House of Lords sustaining the Andrews patent, and adjudging the Alsop process to be an infringement of it. In this suit it was fully established that nitrogen peroxide is the active agent of both Alsop and Andrews. Patents for both these processes were also taken out in France, and in litigation between the parties there the Andrews patent has been sustained, and the Alsop process enjoined as an infringement.

After their defeat in the English courts, the Alsops, in order to protect the licensees of their process in the United States, purchased

of Andrews, for a consideration of $300,000, the exclusive right to use that process in this country, and this suit is brought by them for the protection of the rights thus secured.

Turning now to the defendants, they are engaged in the manufacture and sale of a machine which embodies the Andrews process. They produce their nitrogen peroxide chemically. It is fully established, and in fact conceded, that the machine made and sold by them embodies the Andrews process. Under well-known principles, therefore, the defendants are guilty of contributory infringement. It is quite likely that they were led to engage in their business from the fact that the only process here employed was the Alsop process using the electric method, and it may be that when the defendants began manufacturing their machine they were not aware that a process which produced nitrogen peroxide chemically was an infringement of any patented process, as the Andrews patent had not then been industrially applied in this country.

The defendants are liable, if the Andrews patent is valid. They challenge its validity upon three grounds: (1) For want of utility. (2) Because it lacks patentable invention. (3) For want of novelty.

The foreign suits above referred to were all brought to final decision while the present suit was pending. In both the French and English trial courts the Andrews patent was held invalid—in the former for want of utility, and in the latter for want of invention. These decisions gave to the defendants great encouragement in the defense of the present suit. It may be doubted whether their defense would have been made if the final result in the appellate courts of France and England had been known to the defendants at the time this suit was instituted, for all the questions that are here involved were there litigated and decided. See In the Matter of Andrews Patent, 23 Patents, Designs & Trade-Mark Cas. 441; same case on appeal, 24 Patents, Designs & Trade-Mark Cas. 349; same case in House of Lords, — Patents, Designs & Trade-Mark Cas. ——. See, also, Flour Oxidizing Co., Limited, v. Carr & Co., Limited, 25 Patents, Designs & Trade-Mark Cas. 428, involving the same patents. Copies of the French decisions have been furnished to us, but the volumes of the French reports containing the decisions, are not given.

Very little evidence was adduced at the trial in support of the defense relating to the utility of the invention. But, since the argument of the cause, the decision rendered by the Secretary of Agriculture on December 9, 1908, wherein it was held that complainant's process of bleaching flour is a violation of Food and Drugs Act June 30, 1906, c. 3915, 34 Stat. 768 (U. S. Comp. St. Supp. 1907, p. 928), has been brought to the notice of the court by counsel. Conceding, without deciding, that such a decision might properly have been introduced in the trial court as evidence, it cannot be brought to this court for that purpose, nor can it be availed of here as a decision of controlling authority. It may be that complainant's bleaching is simply the whiteness of the whited sepulchre—a mere cover for adulteration and fraud. It is urged in argument that whiteness has long been regarded among purchasers of flour as an index of the wheat from which the

flour is made, and of the strength of the flour for bread making and other domestic uses, and that artificial bleaching not only adulterates the flour, so as to make it less wholesome, but also enables the millers and merchants to palm off on the consumer flour made from inferior grades of wheat and possessing inferior strength for flour of better origin and quality, because by the bleaching process they are able to give to flour of all kinds the same outward appearance. The difficulty with this defense in the present case is that it has not been litigated. For a proper determination of these grave issues the court must be instructed by evidence upon two important questions: First, as to adulteration, the court must be informed by scientific experts as to what elements are introduced into the flour by this process, and their effect upon it as an article of food; second, as to fraud, the court must be informed by proper evidence touching the influence of color as an index of the quality and source of flour, and whether or not bleached flour is in fact used as a means of defrauding the consumer. We have no evidence to guide us upon either of these subjects. The defendants have the burden of proof, and their defense must fail. These matters must be left for decision in a case where they are properly litigated. In the absence of the objectionable features just referred to, the process plainly involves patentable utility. It saves the expense of storing flour, and prepares it for immediate use in the domestic arts. Whiteness has long been a desirable quality in flour, and has been the controlling motive in the milling business. The whole system of bolting simply removes the darker portions of the wheat. Furthermore, as a matter of taste, whiteness in flour constitutes utility, within the patent law, as much as whiteness in sugar or yellowness in butter.

On the defense of lack of invention, the only patent cited here, and the only one that exists, is a French and English patent granted to Emile Frichot, in the former country May 9, 1898, and in the latter country July 18, 1899. This patent plainly shows that the inventor was seeking the same industrial result as the Andrews patent accomplishes. Ozone, however, was the agent which he employed. He says:

"The treatment consists in subjecting the flour to the action of nascent oxygen or ozone in the various forms of ozonated oxygen or ozonated air, either in the open air, or preferably in a closed chamber, or again in a vacuum. For this purpose the flour, after undergoing the usual operations of grinding and bolting, is introduced in thin layers, or preferably stirred in a closed chamber, where it is in contact with an atmosphere of nascent oxygen, or of ozonated oxygen or ozonated air, which acts immediately on its particles, sterilizes them, bleaches their gray, farinaceous parts, and prevents the essential oils from undergoing any change. After this oxygenating or ozonizing, the flour is left undisturbed; care only being taken to shovel or stir it from time to time. It is then dried in the open air, or subjected to heat or cold, for the purpose of removing every trace of oxygen or ozone."

Several mechanisms are pointed out for working the process. In all of them the ozone is produced by subjecting air to a silent electrical discharge. In one of these the inventor points out that the flour "descends in presence of the nascent oxygen or ozone."

And again:

"During this descent from the top to the bottom of the chamber, the material is subjected to continuous action and exposed to the ascending current of nascent oxygen."

He again states that in order to obtain a more active ozonated fluid, and to avoid any loss of ozone, he prefers to bring the air, after it has been electrically treated, into immediate contact with the flour. The process is for treating both wheat and flour. We have separated the portions relating to flour. The claim of the patent specifies a process of treating flour, consisting in exposing it "to the action of nascent oxygen or ozone, or by ozonized air or ozonized oxygen in the open air, or preferably in a closed chamber, by distributing it in thin layers in presence of a stream of ozonated fluid or a current of pure, dry, cold air or oxygen, becoming ozonized by contact with metal filings or fine wires placed in glass tubes connected with a high tension electric current as described." Frichot uses the language of alchemy rather than chemistry. Defendant's expert, when questioned as to what was meant by the phrase "nascent oxygen or ozone," stated that in his judgment Frichot meant simply nascent oxygen liberated from ozone. The same is true as to his other phrases, "ozonated air or ozonated oxygen." No significance can be attached to these terms, except nascent oxygen derived from ozone, in combination with air. A careful study of Frichot's patent convinces us, as it did the foreign courts, that ozone is the agent by which he sought to accomplish the results of his process. We reach this conclusion upon two grounds: First, ozone is specifically claimed throughout the patent; second, the mechanism which he indicates for treating air electrically will at least chiefly produce ozone. There may be other by-products, but they were not desired by Frichot. This is substantially conceded by counsel for defendant. But they claim to have proven by experts as the result of laboratory experiments that ozone will not in fact bleach flour, and that the apparatus specified in Frichot's patent produces a small quantity of nitrogen peroxide as a by-product, and that this, though unknown to Frichot, was the agent which produced the results claimed by him. There are several answers to this contention: First. It is not established that ozone will not bleach flour. The evidence adduced by complainants tends strongly to show that ozone alone is capable of producing that result. But to produce this effect the flour must be subjected to the ozone for a considerable time, ranging from a few minutes to several hours. The result is that the flour is tainted and ruined. Second. Ozone is confessedly the principal product of treating air electrically in the method pointed out by Frichot. Flour, if exposed to a gaseous compound of air, ozone and nitrogen peroxide, is bleached by the nitrogen peroxide, but is also tainted by the ozone. Such tainting is undoubtedly one of the results of the Frichot process. He points it out repeatedly in his patent, and provides methods for treating the flour to remove the taint. Complainant's process avoids all tainting of the flour. It is, therefore, patentable over the Frichot process, even if it be conceded that the agent in that process is nitrogen peroxide.

In view of the prior art at the time of the Andrews invention, is their patent void for want of novelty? The prior art that has been brought to our notice is mainly literary. Defendants have ransacked patent offices in America and Europe, and brought together a formidable collection of patents. Many of them are paper patents, and others relate to remote arts. Piecing together excerpts and elements from this wide search, they have built up a formidable speculative argument to show how simple and easy was the step taken by Andrews. This is a form of argumentation familiar in patent litigation. Though it seldom succeeds, it is often the only recourse of the infringer. The patent law, however, has its proper place in the realm of actual industrial life, and not in the limboes of parchment casuistry. The merit of a patent is to be determined, not by its standing in dialectics, but by its actual effects in the art to which it belongs. Judged by that test, the Andrews invention was revolutionary. Within five years after its discovery it had been generally applied in the milling business, both in this country and abroad. It accomplished a new and desired industrial result simply, cheaply, and efficiently. In the presence of such an experience, speculative arguments based on the prior art can seldom prevail. It is first urged in support of this defense that Frichot, if his patent did not directly anticipate the Andrews patent, brought the art of bleaching and aging flour so near to success that the step taken by the Andrews involved no invention. Is this true? The immediate agent of both processes is pointed out in the patents to be nascent oxygen. This is not an independent element, or a new kind of oxygen. It is simply oxygen at the moment when it is passing from one compound into another. Free oxygen is exceedingly unstable. In the presence of other substances it immediately enters into composition. We can conceive of the atom as passing from one compound into another. That passage, however, is infinitesimal in space and instantaneous in time. It can be accomplished only by bringing the compound from which the oxygen is liberated into immediate association with the compound into which it is to enter. The result is that, while the nascent oxygen is producing the bleaching effects desired, other elements in the compound from which it is liberated produce other effects in the compound into which it enters. That was the fatal defect of ozone in the Frichot process. While the nascent oxygen did the bleaching, other elements produced other effects which tainted the flour. Dr. Liebman, a consulting chemist in the English case, well remarks that nascent oxygen "has a meaning only when we know from what it is produced." That is especially true when the substance to be treated is so complex as flour (which embodies some 20 different elements), and is likewise so easily subject to taint as flour. So the teaching of Frichot that nascent oxygen liberated from ozone would bleach flour served as a warning rather than a guide to Andrews, for Frichot's experience also taught that his process would taint the flour.

Nitrogen peroxide is a dark brown gas, deepening in color as the temperature is increased. It has a peculiarly repulsive odor, and is poisonous when inhaled. While it sometimes bleaches, it more frequently imparts color. This is especially true as to proteids, which

are an important constituent of flour. It will turn corn meal and other corn products and rice products yellow. Tobacco is made darker by it. All the experts, those for the defendant as well as those for the plaintiff, agree that it was impossible, at the time the patent in suit was taken out, to foretell the effect of nitrogen peroxide upon a complex substance like flour. Reasoning by analogy, most of them say that the natural inference would have been that it would taint the flour and color it yellow. Dr. Keiser, one of the experts for complainant, names several bleaching agents, among them nitrogen peroxide, which he said he would have supposed, reasoning by analogy, would bleach flour; but he also states that it would be impossible to tell what other effects they might produce. The whole argument of counsel for defendants, in support of their defense that the patent is void for want of novelty, is based upon reasoning by analogy. The foundation of this reasoning is that at the time of the Andrews invention it was well known that numerous substances could be bleached by several well-known chemical compounds; some being bleached by one, and some by another. That was the general art, and it is contended that the Andrews invention was simply the selection of the best of several well-known agents for the accomplishment of the desired result. This reasoning is fallacious. It was not known that any of the recognized bleaching agents could be successfully used in bleaching flour. The accomplishment of that result involved three features: First, an agent that would bleach flour; second, an agent that would accomplish this result without injuring the flour; third, an agent that could be applied to the flour in the usual milling processes. No bleaching agent was known that would accomplish these results. Frichot's was the only attempt that had thus far been made, and he had succeeded only as to the first feature. Science and experience alike warned against the use of nitrogen peroxide. Ozone is the most innoxious of all the bleaching compounds, and it had been found to taint the flour. Nitrogen peroxide, while it sometimes bleached, more often imparted color, and was at the same time one of the most offensive and deadly of gases. It is not true, therefore, as counsel for defendant contends, that the discovery of the nitrogen peroxide process was simply a selection of one of several well-known agents. All that was well known was that there were several agents that would bleach. It was not known that any of the agents could be used commercially to bleach flour. The mere knowledge that there are known chemical agents that accomplish such a general function as bleaching does not advance us a step with such a complex substance as flour and one so susceptible of taint. If it had been known that flour could be bleached commercially by one or more of the ordinary chemical bleaching agents, then the selection of nitrogen peroxide might or might not be the mere selection of a known agent, such as would lack patentable novelty. That would depend upon the advantages that nitrogen peroxide disclosed in the art over other known agents. If those advantages were distinct and conspicuous, a process embodying them might be entitled to the benefit of the patent laws, although it had been discovered that other agents would accomplish the same result in a less successful manner. But the complainant in

the present case occupies a much more favorable position. Here it had not been discovered that flour could be commercially bleached by any chemical agent. The complainant was the first to discover a successful process for accomplishing that result. His act was not selection of known agents in the art of bleaching flour, but was the discovery of the only agent that has yet been found to accomplish that result successfully in the milling industry.

It should also be borne in mind in considering this subject that reasoning by analogy in a complex field like chemistry is very much more restricted than in a simple field like mechanics. This distinction has been frequently recognized by the courts.

"Of course, a discovery to be patentable must have the attributes of invention; but the mental operation is somewhat different in one who invents a machine and one who discovers a process. * * * The mere selection of a material. and this, too, by a process of exclusion, has been deemed sufficient to sustain patentability, and the patent law abounds in instances in which patents have been upheld where the inventor stumbled upon the discovery in total oblivion of the reason why effect followed cause." Badische v. Kalle (C. C.) 94 Fed. 163.

We shall not lengthen this opinion by quoting extracts from decisions to illustrate this principle. It was explained and enforced in the following cases: Celluloid Mfg. Co. v. Zylonyte Co. (C. C.) 35 Fed. 301; Union Tubing Co. v. Patterson Co. (C. C.) 23 Fed. 79, 82; King v. Anderson (C. C.) 90 Fed. 500, 504; Electric Smelting Co. v. Carborundum Co., 102 Fed. 618, 631, 42 C. C. A. 537; Hemolin Co. v. Harway Co., 138 Fed. 54, 56, 70 C. C. A. 480; U. S. Mitis Co. v. Midvale Co. (C. C.) 135 Fed. 103, 107; Tannage Co. v. Donallan (C. C.) 93 Fed. 811, 816; Thomas Co. v. Electric Co. (C. C.) 111 Fed. 923, 930.

The same principle is admirably illustrated by Lord Justice Vaughan Williams, in his opinion involving the Andrews patent. In discussing the limitation of the doctrine of equivalents in patents based upon a chemical process, he says:

"It was urged on behalf of the petitioners that Frichot's patent was an anticipation of Andrews' invention, because all oxidizing agents which liberate nascent oxygen are chemical equivalents, and if you once have a man say, 'I propose to bleach flour by nascent oxygen which is liberated from ozone,' that is an anticipation of the subsequent patent, which says, 'I propose to bleach flour by an oxidizing agent of another character which only operates, and can only operate, by the liberation of nascent oxygen or its equivalent.' The answer to this is put in this way: *That you cannot apply the doctrine of mechanical equivalents to a chemical patent*, because you cannot predicate that all oxidizing agents will act in the same way, and cannot, therefore, predicate that in conditioning flour an oxide of nitrogen, or an oxidizing agent of the chlorine or bromine type, will act in the same way as ozone or any other oxidizing agent mentioned in Frichot's patent." 24 Patent, Design & Trade-Mark Cases, 365.

The learned judge qualifies the language which we have italicized later in the opinion when speaking of the doctrine of equivalents in chemical cases, and states the correct rule with remarkable precision as follows:

"The doctrine does apply in cases where, having regard to the subject-matter, it can be truly asserted that one of two or more chemical substances is

*well known as producing the same effect on the same subject-matter."* 24
Patent, Design & Trade-Mark Cases, 366.

When it is sought to ascertain the state of the art by means of prior
patents, nothing can be used except what is disclosed on the face of
those patents. Such patents cannot be reconstructed in the light of the
invention in suit, and then used as a part of the prior art. That, how-
ever, is precisely what the defendants attempt to do in this case in re-
spect to the Frichot patent. That patent disclosed ozone as the source
of the nascent oxygen used for bleaching flour. Defendants say that,
while such is the real character of the verbal disclosure on the face of
the patent, the process actually produced nitrogen peroxide, which was
in fact its bleaching agent. There are two objections to that kind of
reasoning in this case: First. Frichot himself designates ozone as the
primary basis of his process. The mechanism which he points out for
producing his gas will produce ozone. There is nothing on the face
of his patent to teach the world that nitrogen peroxide was an efficient
agency for the bleaching and aging of flour. Second. Frichot's patent is
a paper patent. He never applied in the industrial world the art which
his patent disclosed. It may be that, if he had transferred his paper
patent to the milling industry, it would then have disclosed nitrogen
peroxide as its active agent. This, however, he did not do, and the
expert chemists employed by the defendants in this case to work the
Frichot apparatus in their laboratory cannot, by their discovery from
that experience, make what they learn a part of the prior art. West-
ern Electric Co. v. Home Tel. Co. (C. C.) 85 Fed. 649, 656; Badische
Anilin Co. v. Kalle & Co., 104 Fed. 802, 808, 44 C. C. A. 201; same
case (C. C.) 94 Fed. 163, 168. Prior patents are a part of the prior art
only by what they disclose upon their face. If they are carried into
effect in the industrial world, what is learned from that experience al-
so becomes a part of the prior art. An expert, however, cannot take
a process patent, which has never been applied industrially, and work
the process in his laboratory, and discover therefrom something which
is not disclosed on the face of the patent, and then transfer that expe-
rience back to the time of the patent, and make it a part of the prior
art for the purpose of defeating a meritorious invention. That would
be ex post facto law of the most pernicious character. Such a prac-
tice would be especially misleading in a case like the present. The ele-
ments here involved are so numerous that a slight modification in the
process would be likely to produce conspicuous changes in the product.
The evidence leaves no doubt that an electrical current may be so ap-
plied to air as to produce either ozone or nitrogen peroxide. The silent
current produces ozone. A current of sufficient strength to produce the
flaming arc results in nitrogen peroxide. As you pass from the lower
current to the higher, nitrogen peroxide appears as a product, and the
quantity of ozone decreases; and this change progresses until, when the
flaming arc is reached, a heat is developed which completely consumes
the ozone and leaves nothing but nitrogen peroxide. It is easy to see
how such a process might be worked in the laboratory so as to modify
the result which Frichot himself attained. Again, the working of such
a process, which might be found sufficient to bleach a small quantity of

flour in a laboratory test, might be wholly ineffective if the process were applied in the milling business. What kind of electric current will best produce nitrogen peroxide for the practical bleaching of flour is now well known. We are not dependent upon the laboratory work of experts for evidence on that subject. Wherever the electric current has been used for that purpose in the industrial world, it has been such a current as will produce a flaming arc, creating such a heat as will entirely destroy ozone. That is the only use of the electric current that has been found industrially adequate. The trifling experiments of the laboratory shown by defendant's experts in this case, are not entitled to weight as against the teaching of this practical experience.

The prior art which has been exhibited to us was presented to the English and French courts, and was held unavailable. We shall discuss only those matters that are claimed to be new in the present suit. It is first contended by defendants that it was not disclosed in the foreign litigation that ozone would not bleach flour, and that nitrogen peroxide, as a by-product of the Frichot process, was its real bleaching agent. It is said that the Alsops, who were assailing the Andrews patent in that litigation, did not dare to bring this fact to light, because their own process was electrical, the same as Frichot's, and such a disclosure would have been even more fatal to their patent than that of Andrews. An examination of the report of the foreign litigation does not disclose whether these alleged facts were developed there. It does appear that such distinguished chemists as Sir William Crookes, on the one side, and Sir James Dewar, on the other, testified before the English courts; and it hardly seems probable that the facts here urged, if they were facts, would not have been developed upon that hearing. Be that as it may, a careful reading of the evidence in this case fails to convince us either that ozone will not bleach flour, or that the process of the Frichot patent, when applied according to Frichot's directions, will develop nitrogen peroxide as a by-product. We reach the conclusion, therefore, that Frichot's patent, as a part of the prior art, must stand in this case simply for what Frichot himself declared, and not be enlarged by what defendant's experts claim to have discovered by a laboratory working of that process.

Defendants also urge upon our notice as a part of the prior art two American patents issued to Davis in February, 1901, Nos. 724,753 and 724,754. They relate to a process for the preservation of perishable food products, and accomplish their results by subjecting the food products for a considerable period to the gas engendered by treating air "electrostatically." The patents point out three conspicuous features: The electric current is low; the electrodes are carefully insulated; and direction is given that the temperature of the air be kept low. All of these features indicate that the result of the electrical treatment of the air here taught would be to produce chiefly ozone. The patentee states that ozone is the chief product, but that the ozone is changed in its character before the process is complete, and that the preserving agent is really "the lower oxygen-nitrogen compounds." These patents are not cited so much for the process they disclose as for the chemical dissertation which they contain. It is very doubtful, however, whether

the patentee's chemical theory is sound, in view of the apparatus which he describes. In any event the patent belongs in a remote art, relating to the preservation of food from decay. It has nothing to do either with bleaching or with aging.

The only other matter of any importance that is brought to our notice, which was not before the English courts, is an article in Spons' Encyclopedia of Industrial Arts, published in London in 1881. In the publication the article is entitled "Oils and Fatty Substances—Refining, Clarifying, and Bleaching." The important parts of the article are as follows:

"Many plans of decolorizing oils are in vogue. A process much recommended is to pass nitrous acid gas through the oil."

Numerous other processes are pointed out in the article, which then proceeds as follows:

"Most processes for the bleaching of oils depend upon the oxidation of the coloring matter by some suitable reagent, chiefly involving nascent oxygen in some form. * * * Experiment alone can determine the particular process best suited to any given oil, having regard to the purpose for which it is to be used."

It is probable that the term "nitrous acid gas," used in this article, refers to nitrogen peroxide, as that is the name which the gas bore in the old nomenclature. The article contains no direction as to the process by which the oil is to be treated or the condition in which the gas is to be applied. The character of the oils is not indicated, whether they are oils used for foods, drugs, or paints. If for paints and similar purposes, the imparting to them of an odor or flavor could not be material. Nothing is shown as to the period of time for which the oil is to be subjected to the gas. The chemical knowledge that nitrogen peroxide would bleach oil would not teach that it would bleach flour, and least of all would it teach that it would not taint flour. The bleaching of oil belongs to a remote art, and an encyclopedia disclosure that nitrogen peroxide would accomplish that result does not deprive the Andrews process for bleaching flour of patentable invention.

In connection with this article, as well as the other prior art, the case of Spill v. Celluloid Mfg. Co. (C. C.) 21 Fed. 631, is urged as much in point, and a general statement is quoted from the decision to the effect that:

"The application of an old process or machine to a similar or analogous subject, with no change in the manner of application, and no result substantially distinct in its nature, will not sustain a patent, even if the new form of result has not before been contemplated."

We are unable to find any analogy between that case and the present. There prior patents had taught that vegetable fiber could be bleached by certain chemical agents. The patent in suit applied those agents to vegetable fiber after it had been crushed. As the court says:

"The only difference was that the product was bleached vegetable fiber in the shape of converted gun cotton, instead of bleached vegetable fiber not so converted."

Under such circumstances it is quite plain that the former patent anticipated the later.

We have carefully examined the voluminous record in this case, and the almost equally voluminous briefs. It would prolong this opinion to unreasonable lengths to discuss each of the separate subordinate matters argued by counsel. They have all been considered, and in our judgment present no justification for a decree in favor of the defendant. The decree in favor of the complainant must therefore be affirmed.