## BLAKE AUTOMOTIVE EQUIPMENT CO. v. CROSS MFG. CO.

(Circuit Court of Appeals, Eighth Circuit. May 19, 1926.)

No. 7097.

1. Patents �—72—Anticipation is not made out by fact that prior existing device could be changed, so as to produce same result, where such prior device was in common use, without it occurring to any one to adopt change.

Anticipation is not made out by fact that prior existing device, shown in prior patent, may be easily changed, so as to produce same result as that of patent in suit, where prior device was in common use, without it occurring to any one to adopt such change.

2. Patents �—328.

Barrett patent, No. 1,228,515, for improvements in snubbers, claims 1, 2, 3, *held* valid and infringed.

3. Patents �—328.

Cross patent, No. 15,197, claims 5, 6, for improvements in shock absorbers, *held* valid and infringed.

Appeal from the District Court of the United States for the Eastern District of Missouri; Charles B. Faris, Judge.

Patent infringement suit by the Cross Manufacturing Company against the Blake Automotive Equipment Company. Decree for plaintiff, and defendant appeals. Affirmed.

H. G. Cook, of St. Louis, Mo., for appellant.

Albert G. McCaleb, of Chicago, Ill. (Clifford C. Bradbury, of Chicago, Ill., on the brief), for appellee.

Before LEWIS, Circuit Judge, and MUNGER and JOHNSON, District Judges.

LEWIS, Circuit Judge. Appellee as owner of Letters Patent No. 1,228,515 granted for Improvements in Snubbers to William N. Barrett on June 5, 1917. and of reissued Letters Patent No. 15,197, for Improvements in Shock Absorbers, granted to Harry Cross on September 20, 1921, obtained a decree, from which this appeal has been taken, adjudging that appellant had infringed upon appellee's rights by making, using and selling shock absorbers embodying said patented inventions and each thereof; and further, adjudging that appellee recover damages and profits to be ascertained. It was found that Claims 1, 2 and 3 of the Barrett patent, and 5 and 6 of the Cross patent, had been infringed by appellant's device. The general purpose of each invention is to prevent an extreme and too rapid rebound of the car body from spring compression in automobiles.

The field was not new. It had been exploited and progress made, as shown in prior patents, domestic and foreign, plead and offered in evidence as anticipations. They consist of two issued to Thomas Veitch, one on December 22, 1908, the other on January 26, 1909, each for improvements in shock absorbers; three issued to C. H. Foster, one on February 20, 1912, one on March 10, 1914, and one on March 9, 1915, each for improvement in shock-absorbing devices. These are all American patents. Also three French patents, one granted to Clouard and Vallee December 17, 1904, for shock absorbers, one to Ludovic-Theophile Penau, granted July 6, 1906, for cable shock absorber, and one to Maison Lemoine, granted October 15, 1905, for devices intended to limit and reduce the oscillations of chassis and frames of automobiles and other vehicles. Also a British patent for improvements in devices for preventing vibrations in vehicles, application for which by Andre Christophe et al., citizens of the French Republic, was accepted in 1907. All of these, including the two patents in suit, are referred to as strap-and-friction-track snubbers; because they consist of a strap or cable drawn over a convex surface, one end of which is fastened to the axle of the vehicle and the other by intermediate means to the vehicle body—the means employed consisting of mechanism for taking up the slack in the strap as the springs go into compression, and gradually releasing it under tension on the rebound. The method generally employed in the cited patents, as in the ones in suit, is to first pass the upper end of the strap over the friction surface (in some a drum) and then attach it to a tension spring, or to a drum actuated by a winding spring; the whole being firmly fastened to the car body. In somewhat stilted but conventional phraseology we find Barrett's claims in suit stated thus in his patent:

"1. In a snubber, the combination of the members forming a means of attachment to an axle and a car body; a curved friction surface carried by one of the members; a friction strap operating over said surface and having one end secured to the opposite member, and a rotatively mounted spring device arranged within the curve of the friction surface operating upon the opposite end of the strap, and increasing the braking action of the strap as the members separate.

"2. In a snubber, the combination of the members forming a means of attachment to

an axle and a car body; a curved friction surface carried by one of the members; a friction strap operating over said surface and having one end secured to the opposite member; a wheel rotatively mounted within the curve of the friction surface to which the opposite end of the strap is secured; and a spring resisting the movement of the wheel.

"3. In a snubber, the combination of the members forming a means of attachment to an axle and a car body; a cover plate rotatively mounted; a curved friction surface carried by the cover plate; a friction strap operating over the surface and having one end secured to the opposite member; a spring operating on the opposite end of the strap; and means for rotatively adjusting the cover plate to vary the length of friction surface engaged."

Cross confined his discovery to means for adjusting and controlling the tension spring from the outside without opening up Barrett's housing, which encloses the whole mechanism attached to the car body, his two claims in suit reading thus:

"5. A shock absorber for a vehicle body supporting spring comprising in combination the following elements: a pair of members forming means of attachment to the vehicle parts between which the spring is interposed, a friction strap extending between the said members, a curved friction surface carried by one of said members, a rotatable drum also carried by said last mentioned member and mounted for rotation within the curve of said friction surface, said strap passing over said friction surface and having one end attached to the drum, a spring associated with said drum and exerting on said drum a rotative torque tending to wind the friction strap on said drum, and means for adjusting the tension of said spring without dis-associating the drum from the friction strap or friction surface.

"6. A shock absorber for a vehicle body supporting spring comprising a curved friction track, a drum disposed within the curve of the friction track, means whereon said drum is mounted for rotation in the position stated, a friction strap passing over said friction track and having one end attached to the drum, a coiled spring having one end fixed with respect to the drum and its other end fixed with respect to the aforesaid means whereon the drum is mounted, and a device normally locking the means whereon the drum is mounted against rotation, said means whereon the drum is mounted, when unlocked, being capable of rotation, to adjust the tension of said spring."

The issue, as in such cases, was whether the improvements described were new and useful devices and exhibited inventive genius. That they were new and useful seems to be demonstrated by the fact that appellee's licensee, since it commenced the sale of shock absorbers on May 1, 1922, made under the patents in suit, sold during the first eight months thereafter 87,320; during 1923, 298,460, and during the first eleven months of 1924, 324,740; and also by the fact that appellant did a large business in disposing of the infringing device. That the patents in suit disclose invention is prima facie established by the patents themselves.

It is argued that Barrett's Claims 1 and 2 are invalid for want of patentable novelty in view of Clouard and Vallee, and also Veitch's No. 910,974. Some of the patent drawings showing the devices will be helpful:

Appellant's counsel called three experienced mechanics. He had previously submitted to them the problem of condensing the Clouard and Vallee device because it was

too wide. Its size made it cumbersome and prevented convenient housing as a protection from mud, etc. These witnesses were in turn interrogated and gave answers in substance as follows:

"Q. Mr. Schafer, I will ask you if you were asked, as a mechanic, to condense or compress this device (Clouard and Vallee's) because it was too wide, in what manner would you compress or condense it? A. It would depend on how much room you needed. If you want it right together you put one in the center, or bring them as close as necessary to operate it; put the spring in the drum.

"Q. You mean by that, that you would place the spring drum within the friction drum? A. Yes, sir.

"Q. Superimpose the two sections on each other? A. Yes, sir.

"Q. How would you get your strap out of your friction drum so it would pass to the axle, if you did that? A. You are using about one-third of your friction drum. You can cut the rest away. You don't need it.

"Q. You would cut away such portion of the friction drum as you did not need? A. Yes, sir.

"Q. And then pass the strap out and over the friction drum over the axle— A. According to this drawing you are using about one-third of your drum surface.

"Q. In this drawing it appears that the spring drum is about the same size as the friction drum. What would you do in that contingency? A. Either enlarge the one or make the other one smaller.

"Q. That is what you would do as a mechanic? A. Yes, sir.

"Q. If you were asked how you would increase the tension of your spring within the spring drum, what means would you employ as a mechanic? A. Well, it looks here like the strap is fastened to a pin. That pin could be wound up like a watch and held there by a ratchet, or, if you wanted a cheap device you could have a lock nut. It would be cheaper than a ratchet. It would hold as well.

"Q. You would turn the pin to which one end of your spring is attached— A. Yes, sir.

"Q. And then lock it in position by a lock nut? A. Yes, sir.

"Q. Do you recall discussing this matter with me some weeks ago? A. I do.

"Q. At that time do you recall that this drawing of this French patent to Clouard and Vallee was shown to you? A. Yes, sir.

"Q. Subsequent to that time has this matter been under discussion between you and me up until to-day? A. No, sir.

"Q. Has the matter been under discussion with any one else, between that time and this? A. No.

"Q. At the time that I first discussed this with you, did you give me the same answer that you have given to me to-day? A. Yes, sir.

"Q. That is the way, as a mechanic, you would compress or condense this device, as you told me then? A. Yes, sir."

On this it is contended the patented improvements were not inventions but mere mechanical steps apparent to any one familiar with the art when Barrett entered the field. Thirteen years had passed since Clouard and Vallee, the best device was being diligently sought during that time, here and abroad, and if the change from Clouard and Vallee to Barrett was only a simple mechanical step to be readily seen by those familiar with the art it is difficult to understand why it was not sooner discovered. Is it not more reasonable to believe that the problem was not so simple as counsel now attempts to make out, that it would not have occurred to him if he had not already seen Barrett's solution, nor to his witnesses if he had not stated it to them and confined its consideration to a small and segregated part of the prior art? By confining the inquiry to a consideration of Clouard and Vallee's device, and telling the witnesses the purpose of the suggested change, the very problem which Barrett conceived and worked out was put into the minds of the witnesses. It would seem an easy task to destroy most all patents by that method, after having lodged in the mind of the witness the inventive conception and the problem for solution. The three witnesses spoke only of a mechanical change, but we think there were functional differences between Clouard and Vallee and Barrett, as the testimony hereinafter noted will show. We take it to be a sound principle, as stated in Electric Candy Machine Co. v. Morris (C. C.) 156 F. 972, 976:

[1] "Nor is an anticipation made out by the fact that a prior existing device, shown in a prior patent, may be easily changed so as to produce the same result as that of the device of the patent in suit where the prior device was in common use without it occurring to any one to adopt the change suggested by the patent in the suit."

See Loom Co. v. Higgins, 105 U. S. 580, 591, 26 L. Ed. 1177.

In Naylor v. Alsop Process Co., 168 F.

911, 920, 94 C. C. A. 315, 324, this court said:

"When it is sought to ascertain the state of the art by means of prior patents, nothing can be used except what is disclosed on the face of those patents. Such patents cannot be reconstructed in the light of the invention in suit, and then used as a part of the prior art."

See Stead Lens Co. v. Kryptok Co., 214 F. 368, 375, 131 C. C. A. 144; Detroit Motor Appliance Co. v. Burke (D. C.) 4 F.(2d) 118, 121.

On this subject Mr. Brush, a thoroughly competent and experienced witness for appellee, stated that in his opinion there was nothing whatever in the prior art set up in the case to suggest the Barrett construction to an engineer or an expert mechanic; in fact, he thought the art was suggestive of doing something quite different. Mr. Brush is an experienced engineer specializing in automobile construction. At the time he testified he had been actively engaged in engineering work in connection with automobiles for about 25 years, had been chief engineer for the Cadillac Company and for the Oakland Company, and consulting engineer for General Motors Corporation. Since 1913 he has acted only as an independent consulting engineer. He took up each of the patented devices relied on by appellant and compared them with Barrett's. In making his comparisons he said that some of the prior patents relied wholly on the pull of the tension spring against the vehicle springs, as in Lemoine, and stated that that kind of a device does nothing in the way of controlling rebound, that in all of the patents considered in this case it was necessary to interpose the friction element to control the rebound and that Barrett, in interposing that element, was the first to appreciate the fact that the friction pull must increase as the vehicle springs return to their normal position. The function of a tension spring is to rewind the strap and supply on the unwinding sufficient resistance at the inner end of the strap to cause the desired amount of friction. The initial resistance is supplied by the tension of the unwinding spring, but Barrett, by bringing the friction surface into the form of an open curve uses a variable radius, shorter at the beginning of the strap contact, which is a great advantage in producing friction with a relatively small tension of the friction spring; and yet this does not interfere with the free winding of the strap; that in Barrett the span of contact between the friction surface and the strap is constant and not variable, and because of this, and the other facts just stated, the resistance to the return of the springs to normal is least in Barrett's device where the flexor of the springs is most, and increases rapidly as the springs approach normal, thus enabling the vehicle to ride with the carrying springs in normal position. He said this was not true in any of the other devices, that in Veitch the wrap of the strap around the friction surface is greatest when the vehicle springs are deflected most, that this created a tendency in the vehicle to ride with the carrying springs continually deflected if a series of unevenness is passed over by the vehicle; and that it is necessary to an increasing resistance on the rebound that the extent of friction surface be not variable but constant at all times throughout the extreme reaction of the springs. In those respects Christophe was like Veitch. He said Penau was a variant form of Veitch, and after considering Foster he concluded that those devices bore no relation whatever to the problem which Barrett solved. Clouard and Vallee lacked the compactness and housed condition of the Barrett device, the variable radius of the friction surface shown in Barrett, and the arrangement for adjusting the arc of friction contact, which under Barrett could be made to meet the requirement of cars of different weight, and that no one but Barrett enclosed the winding up of the body end of the friction strap within a curved friction surface. He stated that in his opinion as an engineer, with knowledge of the extent and permissible control of dynamic forces involved, Barrett had solved the problem in a different and better way than any of the patents relied upon. There was no testimony opposed to that of Mr. Brush, and we are not able to say, from an examination of the patents relied on, as compared to those in suit, that his statements and conclusions were not sound.

[2, 3] But little has been said in the record and briefs about the Cross patent. So far as we are advised his device was applied to and used in connection with that of Barrett. By thus using it the tension of the winding spring is adjusted without taking apart the entire assembled structure attached to the car body. It is clearly a useful improvement on Barrett. Appellant found it so and used it in his infringing device. The court found both patents valid and that appellant had infringed the claims of each, as heretofore stated. We think the conclusions reached are supported by the proof and the decree is

Affirmed.