SHAWNEE MILLING CO. v. TEMPLE, U. S. Dist. Atty., et al.

UPDIKE MILLING CO. v. SAME.

(Circuit Court, S. D. Iowa, C. D. May 10, 1910.)

Nos. 2,490, 2,492.

1. INJUNCTION (§ 85*)—SCOPE OF RELIEF—ENFORCEMENT OF CRIMINAL OR PENAL STATUTES.

A bill for injunction to restrain the enforcement of a criminal or penal statute is allowable when the statute is unconstitutional or invalid, where, in an attempt to enforce it, property rights are invaded, or where oft-repeated attempts to enforce it would create a multiplicity of suits, in themselves oppressive.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 155, 156; Dec. Dig. § 85.*

Restraining criminal proceedings, see note to Arbuckle v. Blackburn, 51 C. C. A. 133.]

2. INJUNCTION (§ 85*)—CIVIL PROCEEDINGS.

Rev. St. § 723 (U. S. Comp. St. 1901, p. 583), declaring that suits in equity shall not be sustained in either of the courts of the United States in any case where plain, adequate, and complete remedy may be had at law, prohibits the filing of a bill in equity to enjoin the enforcement of a valid statute by civil proceedings.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 155, 156; Dec. Dig. § 85.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date. & Rev'r Indexes

**3.** EVIDENCE (§ 7*)—JUDICIAL NOTICE—QUALITIES AND PROPERTIES OF MATTER.
Judicial notice will be taken of the fact that good, sound wheat of the best variety, properly and timely harvested, put through the sweat in the stack, well ground and bolted, makes nutritious, wholesome, and white flour.

[Ed. Note.—For other cases, see Evidence, Dec. Dig. § 7.*]

**4.** FOOD (§ 22*)—BLEACHED FLOUR—INJURY TO HEALTH—QUESTION FOR JURY.
Whether flour, bleached by the use of nitrogen peroxide under the Andrews' patent, or pursuant to the Alsop process, is flour so treated that inferiority is concealed, or contains added poisonous ingredients which may render it injurious to health, in violation of National Pure Food Law June 30, 1906, c. 3915, 34 Stat. 768 (U. S. Comp. St. Supp. 1909, p. 1187), is a question of fact for determination by a jury, or by the court if a jury is waived.

[Ed. Note.—For other cases, see Food, Dec. Dig. § 22.*]

**5.** COMMERCE (§ 33*)—REGULATION—NATIONAL PURE FOOD LAW—VALIDITY.
The national pure food law (Act Cong. June 30, 1906, c. 3915, 34 Stat. 768 [U. S. Comp. St. Supp. 1909, p. 1187]) prohibiting transportation in interstate commerce of any article of food so treated, whereby its inferiority is concealed, or containing added poisonous ingredients which may render it injurious to health, was not an exercise of police power within the exclusive jurisdiction of states, but was within the jurisdiction of Congress, as a proper regulation of interstate commerce.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 33.*]

In Equity. Bills by the Shawnee Milling Company and the Updike Milling Company against Marcellus L. Temple, United States District Attorney, and Frank B. Clark, United States Marshal, and others, to restrain them from seizing complainants' flour in interstate shipments under the national pure food law (Act Cong. June 30, 1906, c. 3915, 34 Stat. 768 [U. S. Comp. St. Supp. 1909, p. 1187]). Bills dismissed.

Ed P. Smith, A. E. Helm, and Bruce S. Elliott, for complainants.

Pierce Butler, Asst. U. S. Atty. Gen., and Marcellus L. Temple, U. S. Atty., for respondents.

SMITH McPHERSON, District Judge. Each of these two cases is by a bill in equity, practically the same. One of complainants, Updike Milling Company, is a corporation under the laws of Nebraska, there engaged in the business of manufacturing wheat into flour both for domestic use and for shipments into Iowa and other states for sale and consumption. The other complainant, Shawnee Milling Company, is a corporation under the laws of Kansas, there engaged in a like business, sales, and shipments.

The defendants are the United States attorney and marshal for this district, and the relief sought is to enjoin the respondent officers from having issued, or serving process for seizing complainants' flour in interstate shipments under the national pure food statute of June 30, 1906 (Act June 30, 1906, c. 3915, 34 Stat. 768 [U. S. Comp. St. Supp. 1909, p. 1187]).

The allegations are that complainants' flour is whitened and aged by a process, and that the same is not harmful, but is more nutritious, wholesome, and attractive for making bread. It is not alleged in the bill of complaint in terms that the flour is bleached by the Alsop pro-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

cess as covered by certain English and American patents, as set forth by the Circuit Court of Appeals for this circuit in the case of Naylor v. Alsop Process Company, 168 Fed. 911, 94 C. C. A. 315; but all the arguments, both by briefs and orally, were on that state of facts. Counsel for the United States have appeared for the defendants, thereby in effect making the cases controversies between the United States government, on the one side, and western flour mill owners, on the other, who bleach their flour by the agency of nitrogen peroxide gas under the Alsop patent process.

A literal reading of the bills of complaint will show that they are fairly subject to criticism; that the allegations as to the aging, whitening, and improving the flour are largely by the use of adjectives and adverbs, instead of reciting just what is done, how the flour is aged, how whitened, how made more nutritious, why not harmful, and why better by the use of some agency not named nor described. But this criticism need not be elaborated. The cases are now for determination on demurrers to the bills of complaint, and sufficient allegations appear to cover the rulings now to be made.

A bill in equity in which the writ of injunction can issue to enjoin the enforcement of a criminal or penal statute is allowable only when: (1) Such statute is unconstitutional or otherwise invalid; (2) in the attempt to enforce such invalid statute, rights of property are invaded and trampled on; or (3) the often repeated attempts to enforce such invalid statute creates a multiplicity of actions which are of themselves oppressive.

The important and recent case of Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, illustrates this, in which case it was held that a bill in equity would confer jurisdiction because of the oppressive penalties if an effort should be made to protect the rights of property. In City of Hutchinson v. Beckham, 118 Fed. 399, 55 C. C. A. 333, the Circuit Court of Appeals for this circuit held that an injunction should issue against the prosecution of cases under an invalid ordinance requiring an illegal license, which would be followed by many criminal prosecutions. In Dobbins v. Los Angeles, 195 U. S. 223, 241, 25 Sup. Ct. 18, 22 (49 L. Ed. 169), the holding was clearly and tersely stated:

"It is well settled that, where property rights will be destroyed, lawful interference by criminal proceedings under a void law or ordinance may be reached and controlled by a decree of a court of equity."

But if property rights are not invaded, then a court of equity ordinarily will not interfere, because the defense as to the invalidity of the statute can be urged in the criminal or penal action or special proceeding. Thus, in the case of In re Sawyer, 124 U. S. 200, 8 Sup. Ct. 482, 31 L. Ed. 402, it was held that proceedings for the ouster of a city officer could not be enjoined for the alleged invalidity of the law under which the proceedings were being conducted. And of like holdings are the cases of Harkrader v. Wadley, 172 U. S. 148, 19 Sup. Ct. 119, 43 L. Ed. 399, and Fitts v. McGhee, 172 U. S. 516, 19 Sup. Ct. 269, 43 L. Ed. 535. And if the proceedings for seizure are to be regarded as civil, then section 723, Rev. St. (U. S. Comp. St. 1901, p.

583), will prohibit the filing of a bill in equity to enjoin the enforcement of a valid statute.

In the one case now before the court, the bill of complaint recites that several seizures of flour were made in this judicial district, and, after a number of efforts by the complainant to have the cases submitted to the court with or without a jury for a hearing on the merits, the government dismissed the cases, after the flour thus seized had deteriorated in quality and value. In the cases now before the court, as property rights are involved, bills in equity will be entertained, provided the statute under which the government claims the rights to proceed is not a valid one. Herein is the question in the case, that is to say: Is the pure food statute of June 30, 1906, a valid enactment? Did Congress have the power to enact it? Is it within the commerce clause of the Constitution, or is it a mere police regulation, garbed and cloaked as a regulation of commerce?

Good, sound wheat of the best variety, properly and timely harvested, put through the "sweat" in the stack, well ground and bolted, makes nutritious, wholesome, and white flour. This fact is so generally known that courts will take judicial notice of the fact.

It is said that flour made from new and poorer wheat, not "sweated," and made by the process covered by the English patent of Andrews, or the American patent of Alsop as illustrated in the patent decision hereinbefore referred to (168 Fed. 911, 94 C. C. A. 315), will also be equally white. This is quite likely true. But is it equally pure, equally nutritious, or is it adulterated and poisoned?

This court in these cases is not to decide those questions. Nitrogen peroxide gas under the Andrews patent is produced by combining nitric acid with a metallic compound. Under the Alsop patent it is produced by subjecting atmospheric air to a flaming electric arc. It is claimed by some that nitrogen peroxide is the agent for bleaching flour under both patents, while others claim that it is the ozone that does the effective work, while the nitrogen peroxide is a by-product when the ozone is thereby created.

Whatever the truth is as to what does the bleaching, it is both claimed, and denied, by chemists who ought to be able to agree, that the flour is poisoned by such process. But it is known that, after the air is thus subjected to continuous flaming electrical discharges, the resultant gas is conveyed by means of pipes to a compartment, and there is commingled with the flour agitated or in a cloud, and thus subjected to said treatment it becomes dry and white. The result of it all is that new wheat and of an inferior quality is converted into flour with the appearance of flour from a better wheat that has been aged by time.

The government contends that flour thus bleached is flour in the language of the statute "whereby inferiority is concealed," and that "it contains added poisonous ingredients which may render such article (flour) injurious to health." The patentees and the millers deny this.

Here is a question for determination by a jury, or by the court if a jury is waived, and not to be determined in this case if the statute is valid.

Several of the states within the past few years have enacted pure food statutes. Congress, June 30, 1906, enacted the statute in question. All these statutes were enacted to cure evils well nigh intolerable that had grown up during this age of greed and avarice and commercialism that has made money getting the prime object of life with so many. The evils were such that much of the foods we ate, whether meats of any kind, including fish and poultry, or fruits in all forms, and bread-stuffs, were so adulterated and "loaded" or "doctored" as to deceive the consumer. And the same was true of flavors and condiments. The evil as to confectionery and extracts was as great. Still greater was the evil as to drugs and medicines. In fact, the evils were everywhere present, as to food and medicine, and other things. And to eliminate some of these evils, and to enable the purchasers to receive what they ordered and paid for, many states passed statutes aimed at those frauds. But it was soon found that the states in some instances were disposed to condone as to some articles of local manufacture, and in many other instances the states were powerless to work out a remedy. Thereupon Congress, acting upon the theory that the evil was of national concern, enacted the statute in question. The debates in Congress show that the measure was earnestly fought as being one of paternalism, and a police regulation with which the states only could act.

The Secretary of Agriculture, Mr. Wilson, performed his duty both in letter and spirit when he submitted the question as to flour bleached by nitrogen peroxide to the board of food and drug inspection; and that board, the secretary concurring, after a hearing given to all parties in interest, found that such flour is in contravention of the statute. Such finding is not binding as against the parties thus bleaching flour. But it is conclusive as against all criticism for making the seizures and bringing the question before the courts for determination.

Congress is given the power to provide for the general welfare of the United States. But without doubt, if this legislation is sustained, it is because of that provision of the Constitution which provides that the Congress shall have the power to regulate commerce among the several states. That provision is the life of the nation, and to adopt which was the great concern of the Convention of 1787. Important as it is, it is ever before the courts. It gives great comfort to all who believe in one common country, and yet is antagonized oftener than any other provision of the Constitution, by those whose shield of defense is articles 9 and 10 of the amendments, as to the reserved power of the states.

No one claims that Congress can be the sole judge of its powers. All thoughtful persons concede that any court having jurisdiction in the first instance must pass upon the question of the powers of Congress, and that it is for the Supreme Court in the end to finally set the matters at rest. But so careful have our Congresses and Presidents been, that for the first hundred years of our government the Supreme Court found it necessary to hold that Congress had exceeded its powers in only 20 instances. See Appendix to 131 U. S. ccxxxv. And of those 20 statutes thus held void not one related to commerce. Since then, the Supreme Court has held three congressional enact-

ments void. One was a statute making a judgment of conviction conclusive evidence against a party in another case. Kirby v. U. S., 174 U. S. 47, 19 Sup. Ct. 574, 43 L. Ed. 809. Another was the income tax case. Pollock v. Farmers' Loan Co., 157 U. S. 429, 15 Sup. Ct. 673, 39 L. Ed. 759, and 158 U. S. 601, 15 Sup. Ct. 912, 39 L. Ed. 1108. The other, and only one from the organization of our government to date as to commerce, is that of the employer's liability statute, enacted under the claim that the commerce clause would sustain it. Employer's Liability Cases, 207 U. S. 463, 28 Sup. Ct. 141, 52 L. Ed. 297. If other enactments of Congress have been held void by the Supreme Court, such cases have been overlooked, and it is believed there are none other. There are almost innumerable decisions touching the power of the states with reference to commerce. It would be to no purpose to discuss many of these authorities. And it would be a needless waste of energy to discuss the many decisions relating to the use of the mails, for the obvious reason that a distinct clause of the Constitution empowers Congress to control our postal system, and there is not the slightest difference whether the mails thus carried are state or interstate.

Neither the court nor the parties are aided by a review of those matters. It must be and is conceded that police regulations alone are for the state, and not for Congress, to deal with.

But it does not follow that, if the subject-matter to be regulated is one of commerce, it is for the state alone to deal with, because such subject-matter is also one that pertains to the morals, health, or good order of the community.

Thus, when the question arose as to the inspection of meats for food, Legislatures claiming that they alone could determine when and to what extent police regulations should be carried, the Supreme Court decided that such inspection also impinged upon the rights of commerce and were therefore void. Minnesota v. Barber, 136 U. S. 313, 10 Sup. Ct. 862, 34 L. Ed. 455; Brimmer v. Rebman, 138 U. S. 78, 11 Sup. Ct. 213, 34 L. Ed. 862.

It will serve no purpose to discuss the principle upheld in Wilson v. Black Bird Creek Company, 2 Pet. 245, 7 L. Ed. 412, that the state can regulate certain interstate commerce of a local character, if Congress has not acted, nor of that other principle upheld by Congress that the state can legislate with reference to liability of a party when doing an interstate business when Congress has not acted. Sherlock v. Alling, 93 U. S. 99, 23 L. Ed. 819. The complete answer to those suggestions is that in the matter now before the court Congress has acted. The question now for consideration is not as to the power of the states relating to commerce, as held in Smith v. Alabama, 124 U. S. 465, 18 Sup. Ct. 564, 31 L. Ed. 508, upholding a state statute requiring a locomotive engineer even though operating an interstate train to submit to tests for color blindness.

The question here is as to the power of Congress over articles of interstate commerce, even though such articles in the end become subject to state statutes. No one doubts but that wheat and flour, as well as all articles of food, are subjects of commerce, and, when carried over and across state lines, are subject to be regulated by Congress.

And it is no answer to say that when adulterated, or wrongly labeled, because in the end they will fall under a state statute, they when being shipped cannot be covered by a congressional enactment. The liquor cases illustrate this, because of all the subjects of commerce there is no one thing more peculiarly and distinctly and appropriately subject to regulation by the state, even to the extent of prohibition, than are intoxicating liquors. And yet Congress legislates with reference to liquors. The Wilson act of 1890 (Act Aug. 8, 1890, c. 728, 26 Stat. 313 [U. S. Comp. St. 1901, p. 3177]) provided that when liquors arrived in a state they should be subject to state laws. This statute was upheld in the case In re Rahrer, 140 U. S. 545, 11 Sup. Ct. 865, 35 L. Ed. 572, thereby modifying the practical effect of the holding in Leisy v. Hardin, 135 U. S. 100, 10 Sup. Ct. 681, 34 L. Ed. 128, that the state could not interfere by legislation as to liquors shipped interstate as long as the liquors were in the original packages; while in Rhodes v. Iowa, 170 U. S. 412, 18 Sup. Ct. 664, 42 L. Ed. 1088, it was held that the liquors must be in fact and actually delivered to the purchaser before the state laws became effective as to such interstate shipment. No one should doubt but that legislation by Congress can control the interstate subject of commerce for a time at least, and then the state by a police regulation can control.

If liquors do not sufficiently illustrate the question, lottery tickets will. The Louisiana Lottery was conducted by men of high repute and much renown. But it became a national scandal. It was struck at by denying it the use of the mails. The Legislature of the state gave it encouragement, even its life. But Congress provided in addition that it should be a crime to carry lottery tickets from one state to another by means other than through the mails. Can any person doubt but that the Louisiana Lottery was or could have been made subject to the laws of Louisiana? And yet this congressional enactment was upheld in the Lottery Case, 188 U. S. 321, 23 Sup. Ct. 321, 47 L. Ed. 492. But little need be said of that case. It was argued by counsel of great eminence. It was argued upon two separate occasions. It received the fullest consideration by the Supreme Court. Apparently no other case that was ever before that court received more attention and fuller consideration. Counsel for complainants herein concede all these things. And the only answer that has been made, or that can be made to that case, is in the statement that the case was decided by a divided court; four justices dissenting. It may be, or it may not be, that that weakens the case as an authority. It is barely possible that later on, that court changing as to its personnel, the decision may be overruled. But such reasoning is a mere speculation. On the other hand, the fact that the court was so divided emphasizes the fact that the court gave great consideration to the question. But be these things as they may, it is not for this court to usurp the prerogative by blindly declining to follow that decision. That decision stands, and as long as it stands it is the law of the country, and this court not only must, but does, cheerfully observe it in all of its phases.

Much more could be said. Cases commencing with Gibbons v. Ogden, and then to date, could be reviewed. The question could be illus-

trated in many ways. But all that would be to no purpose; it would be academic.

Congress has enacted a safety appliance law for the preservation of life and limb. Congress has enacted the anti-trust statute to prevent immorality in contracts and business affairs. Congress has enacted the live stock sanitation act to prevent cruelty to animals. Congress has enacted the cattle contagious disease act to more effectively suppress and prevent the spread of contagious and infectious diseases of live stock. Congress has enacted a statute to enable the Secretary of Agriculture to establish and maintain quarantine districts. Congress has enacted the meat inspection act. Congress has enacted a second employer's liability act. Congress has enacted the obscene literature act. Congress has enacted the lottery statute above referred to. Congress has enacted (but a year ago) statutes prohibiting the sending of liquors by interstate shipment with the privilege of the vendor to have the liquors delivered c. o. d., and to prohibit shipments of liquors except when the name and address of the consignee and the quantity and kind of liquor is plainly labeled on the package. These statutes, police regulations in many respects, are alike in principle to the act of June 30, 1906, under consideration. Can it be possible they are all void?

This statute by its title, and by its every provision, plainly shows that it is with reference to commerce, and that it is not with reference to local police regulations.

It is also contended that so much of section 7 of the statute as relates to food is void because no standard has been fixed. That argument is made because drugs are fixed by a standard recognized by the United States Pharmacopœia or National Formulary, and as to confectionery a standard is fixed by declaring what confectionery "shall not" contain; whereas, as to foods no standard has been fixed. It is a fact most obvious that no standard could be fixed other than was done by Congress. The one provision as to food is that it shall not be mixed so as to reduce or lower or injuriously affect its quality or strength. Another provision is that some substance shall not be substituted wholly or in part for the article. Another provision is that no valuable constituent of the article shall be abstracted. Another provision is that it shall not be mixed, colored, powdered, coated, or stained in a manner whereby damage or inferiority is concealed. Another provision is that poisonous or other deleterious ingredients shall not be added. Still another provision is that filthy, decomposed, or putrid substances shall not be added. And so on more in detail than herein enumerated. These provisions present questions of fact as to every alleged contraband article. This objection is without merit.

This case was argued upon both sides with most signal ability, displaying much learning, and was argued at great length.

The case has received from this court the fullest consideration, and the conclusions are that these bills in equity cannot be maintained, and therefore will be dismissed.